**CALLAWAY MILLS COMPANY and Callaway Mills, Inc., Petitioner,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

**CABIN CRAFTS, INCORPORATED, Petitioner,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

Nos. 21499, 21500.

United States Court of Appeals Fifth Circuit.

June 13, 1966.

Paul M. Carruthers, LaGrange, Ga., Paul C. Warnke, Washington, D. C., for petitioner, Callaway Mills.

John Izard, Atlanta, Ga., William Simon, J. Wallace Adair, John H. Quinn, Jr., of Howrey, Simon, Baker & Murchison, Washington, D. C., King & Spalding, Atlanta, Ga., for petitioner, Cabin Crafts, Inc.

J. B. Truly, Asst. Gen. Counsel, Miles W. Brown, Atty., F. T. C., James McI. Henderson, Gen. Counsel, Washington, D. C., for respondent.

Before JONES, WISDOM and GEWIN, Circuit Judges.

GEWIN, Circuit Judge.

These two cases present petitions to review certain orders and opinions of the Federal Trade Commission filed pursuant to Section 5(c) of the Federal Trade Commission Act, 15 U.S.C.A. § 45(c), and Section 11 of the Clayton Act, 15 U.S.C.A. § 21. The petitions present common questions of law and substantially similar facts and therefore are considered together in this opinion.[1]

1. These are two of twelve administrative proceedings brought by the FTC against members of the carpeting industry for alleged violations of Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C.A. § 13(a).

The facts surrounding the petition of Callaway Mills Company and Callaway Mills, Inc.[2] (Callaway) may be outlined as follows: Callaway is a Georgia corporation which manufactures a wide variety of textile products. Prior to 1950 it was engaged primarily in the manufacture of cloth goods such as towels, draperies, industrial fabrics and similar products. In the manufacture of some of those products, such as bedspreads and bathmats, it used a process known in the industry as "tufting." Instead of weaving an entire piece of cloth at one time, a machine pushes a continuous loop of yarn through a previously manufactured backing and secures it by applying a coating of latex to the underside. During 1950, Callaway successfully adapted this process to the manufacture of carpeting. This accomplishment had a pronounced effect on the carpeting industry, since the tufting process is much more rapid and thus less expensive than the standard weaving process which had been used by older carpet manufacturers for many years. Very soon Callaway began producing tufted carpeting in competition with the "old line" manufacturers who also began using the tufting process along with their weaving process.

For years prior to 1950 and continuing until these proceedings were instituted, the "old line" manufacturers had been granting annual graduated volume discounts to their purchasers who were mostly retail department and home furnishing stores. These discounts ranged from 1 to 5 per cent depending upon the total dollar amount a retailer purchased during a given year. They were usually granted on the total sales of all products from the manufacturer; and "chains" or "buying groups" were allowed to "pool" their purchases to benefit from a higher volume. Naturally, the more a retailer purchased, the less the carpeting cost per square yard. The important effect of the discounts was that they gave a competitive advantage to those retailers who were large enough to buy in volumes which qualified for the higher discount percentages.

This litigation brings into focus a rather unusual situation in two respects. First, the record clearly demonstrates an effort on the part of small manufacturers to enter the market and compete with large companies who have been in the carpeting business for many years. Usually, cases of this type reveal an effort on the part of large, powerful and dominant manufacturers to exert economic pressure on small ones. Secondly, the record further shows clearly that the carpet industry has been entrapped to a degree by the well established practice of granting volume discounts which they all apparently wish to discontinue. As early as 1939 there was a concerted effort by the industry to end the practice. This effort was nullified, however, when the Justice Department filed suit seeking to enjoin the manufacturers from terminating the practice on an industry-wide basis. A consent decree was obtained which forbade any agreement or conspiracy "to refrain from giving volume allowances or rebates to purchasers of rugs and carpets." United States v. Institute of Carpet Manufacturers et al., 1 F.R.D. 636 (S.D.N.Y.1941). Thus, the situation has persisted, and buyers have continued to demand the discounts. No manufacturer has been able to abandon the system alone. It is obvious that all competitors must follow the system or abandon it together, but they are forbidden to do so by the above-mentioned decree. The existence of the practice, full knowledge as to the amount of the discounts, the fact that such discounts are a real and vital factor in the carpeting business, and that customers demand such discounts is a matter of common knowledge to all who are acquainted with the industry.

Prior to 1955 Callaway had refused to give its purchasers volume discounts. However, the record reveals that the purchasers were exerting increasing pressure on it to do so. As a result, Callaway

---

2. Callaway Mills, Inc. is a wholly owned subsidiary of Callaway Mills Company.

adopted the following schedule of discounts:

| Aggregate Annual Purchases | Discount |
|---|---|
| $ 5,000– 7,999 | 1% |
| 8,000–14,999 | 2% |
| 15,000–29,999 | 3% |
| 30,000–49,999 | 4% |
| 50,000 and over | 5% |

The *dollar volume levels* at which the discount percentage figures were set in Callaway's schedule were appreciably lower than those of its competitors, but the schedule of its competitors embraced woven as well as tufted carpets as hereafter discussed.

In 1959, the Federal Trade Commission filed a Complaint against Callaway (and a number of the other manufacturers; see footnote 1) charging it with violation of Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C.A. § 13(a),[3] because it had discriminated in price between purchasers of commodities of like grade and quality to the detriment of competition between them.[4] Prior to the hearing below, Callaway and Counsel supporting the Complaint entered into a written stipulation whereby Callaway admitted the Section 2(a) violation and agreed to limit its case to proof of a "meeting the competition" defense as set out in Section 2(b) of the Act.[5] The parties also agreed to limit the scope of the inquiry to the sample trade areas of Cleveland, Ohio; Cincinnati, Ohio; and Boston, Massachusetts.

During the hearing Callaway produced as witnesses a number of agents for purchasers who testified substantially to the following: Callaway's line of tufted carpeting was "competitive" with the tufted carpeting in the competitors' lines when sold at comparable list prices. Callaway's competitors had been giving annual volume discounts for a number of years prior to Callaway's entry into the market. Prior to its granting of discounts, Callaway's carpeting cost more per square yard than comparable carpeting in competitors' lines. The retailers could not pass the higher cost of Callaway's carpeting to the customer because carpeting sells at established pricing points usually 5 cents under the dollar, i. e., $4.95, $6.95, $7.95 per square yard. The retailers pressured Callaway to give discounts by warning that they would otherwise discontinue buying from it.

Callaway officials testified that Callaway had resisted giving discounts. Officers of the company spent a great deal

---

3. § 13(a):

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them:"

4. The complaints against both Callaway and Cabin Crafts alleged "primary line" as well as "secondary line" price discriminations. However, by stipulation the cases were prosecuted solely for "secondary line" violations.

5. "(b) Upon proof being made, at any hearing on a complaint under this section, that there has been discrimination in price or services or facilities furnished, the burden of rebutting the prima-facie case thus made by showing justification shall be upon the person charged with a violation of this section, and unless justification shall be affirmatively shown, the Commission is authorized to issue an order terminating the discrimination: *Provided, however,* That nothing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor."

of time considering the proper system of discounts. They arrived at the decision to grant them only in order to maintain their present position in the market. The officials also clearly explained why they set the percentage discount figures at lower volume levels than the competition by showing that (1) Callaway makes only tufted carpeting which has never accounted for more than 40–45% of the total carpeting market, while the competition sold both tufted and woven carpeting which accounts for the remainder of the market; [6] (2) Callaway sold in the $4.95 to $13.95 price range while competitors sold carpets which retailed as high as $49.95 and more. Because of resulting smaller volume sales to each customer Callaway had to reduce its volume levels in the schedule to a point where the *net per unit price* after discounts of any given style of carpet would be approximately the same as that of comparable carpeting of the competition. Finally, Callaway produced extensive charts showing that net prices for its carpets of essentially the same style, design and other similar factors, (less discounts and early payment allowances) were substantially equal to those of the competition. *There was no rebuttal evidence whatsoever presented by Counsel supporting the Complaint.*

The hearing examiner found that Callaway had made out a defense under Section 2(b) and dismissed the Complaint. The Commission, with Commissioner Elman dissenting.[7] reversed the hearing examiner on the grounds that Callaway (1) failed to carry its burden under the Section 2(b) defense because it failed to show that its products were of "like grade and quality" as those of the competition; (2) had adopted a "formal pricing system" instead of meeting each individual competitive situation as it arose; and (3) had actually *undercut* the competition by granting discounts at lower volume levels. *Callaway Mills*, Docket No. 7634, .... FTC .... (1964). Callaway then perfected this appeal.

Cabin Crafts, Inc. (CC) is also a Georgia corporation, which prior to 1950 had been in the textile business. After Callaway adapted the tufting process to the manufacture of carpeting, CC also entered the tufted carpeting field. CC's pre-Complaint experience was similar to Callaway's in most respects except that after an actual decline in sales during 1955, it offered the following lower discount schedule after Callaway: [8]

| Aggregate Annual Purchases | Discount |
|---|---|
| Up to $ 9,999 | 0% |
| $10,000– 19,000 | 1% |
| 20,000– 34,999 | 1½% |
| 35,000– 49,999 | 2% |
| 50,000 or more | 2½% |

Prior to the hearing before the examiner, CC also stipulated the existence of a prima facie case under Section 2(a) and limited its proof to a Section 2(b) defense. During its hearing, CC offered the testimony of one Mr. Brenner, its Vice-President for Sales, who had a wide and varied experience in the carpeting industry both with CC and previously with its competitors. Mr. Brenner testified that purchasers had asked for discounts and its sales were "threatened" because of CC's failure to give them.[9]

6. Also Callaway granted discounts only on carpeting while competitors granted them on other items such as "seconds," scraps, and institutional carpeting.

7. Chairman Dixon wrote the majority opinion in which Commissioner MacIntyre concurred. Commissioner Anderson concurred in the result. Commissioner Reilly did not participate, and Commissioner Elman dissented.

8. These *discounts* were given *solely* on tufted carpeting, and only when express-

ly *requested* by a customer. Furthermore, buying groups were not allowed to "pool" their purchases. CC is a much smaller company than Callaway.

9. Mr. Brenner testified as follows:
"Q. Did each of these buyers tell you personally he would not increase his purchases of your carpets because you did not have a volume rebate?
"A. In answering that I would have to say that not only would they not increase the purchases, the possibilities of

He further stated that discounts were given on a smaller percentage basis than either Callaway or the other competitors because that was all CC could afford. He also testified that CC's line of carpeting was competitive and, indeed, "interchangeable" with that of its competitors' products at the same price level.[10]

*Again Counsel supporting the Complaint offered no rebuttal evidence.*

The examiner found for CC and dismissed the Complaint. Again, however, the Commission overruled the examiner and found that CC had (1) failed to show its line was of "like grade and quality" with that of its competitors; (2) adopted a "formal pricing system"; and (3) failed to produce "price lists" conclusively showing it was meeting the equally low price of the competition. *Cabin Crafts, Inc.,* Docket No. 7639, .... FTC .... (1964). CC then perfected its appeal.

### I. "Like Grade and Quality"

The Commission held in both its Callaway and CC opinions that the petitioners failed to carry their burdens of showing that their price discriminations were a "good faith" attempt to meet an equally low price of a competitor because each had failed to present evidence that its carpets at various price levels were "comparable in materials and construction to the products of competitors at similar price levels." In its holding in *Callaway* (and by reference in CC) the Commission stated the following at .... FTC ....:

"A discriminatory lower price set to 'meet' the price of inferior goods is in effect an undercutting of the latter price, and such a discrimina-tory price cannot be characterized as defensive, for it goes beyond the provocation which engendered it. There is no showing in this record that respondents' carpets at various price levels were comparable in materials and construction to the carpets of competitors at similar price levels. Rugs and carpets are not fungible goods of the nature of cement, oil or glucose. The quality and saleability of carpeting depend upon many variables and it offends our common sense to completely ignore all such possible differences and hold, sans affirmative evidence, as did the hearing examiner, that carpeting made by Callaway to sell at a certain price level is similar in grade and quality to all carpeting made by Callaway's competitors to sell at approximately the same level. As a matter of fact, there is some evidence in this record that certain of the favored buyers did not consider the goods they were buying from Callaway as either 'competitive' or 'comparable' with goods they were buying from others. Respondents should have introduced proof as to the comparative quality and saleability of their goods and the competitive goods allegedly defended against. Lacking such proof the finding that Callaway was meeting the price of its competitors is speculative.

"Both the courts and the Commission have consistently denied the shelter of the defense to sellers whose products, because of intrinsic superior quality or intense public demand, normally commands a price higher than that usually received by sellers of competitive goods. For example, the defense will not lie when the price of

---

increasing the purchases, but the possibilities of holding our own level at the time."
And further:
"What actually happened, with two comparable fabrics, the dealer was making less of a markup on our fabric, consequently he was promoting and pushing the other fabric, on which he was making a better profit."

10. Mr. Brenner testified as follows:
"Q. Now, sir, do you make carpets which, so far as the customer is concerned, are interchangeable with competitors carpets, or are your carpets totally different?
"A. In basis they are interchangeable.
"Q. Now, sir can the consumer tell the difference between your $6.95 carpet and somebody else's $6.95 carpet?
"A. Not of similar fabrics, no."

Lucky Strikes is dropped to the level of a 'poorer grade of cigarettes,' Porto Rican American Tobacco Co. v. American Tobacco Co., 30 F.2d 234, 237 (2d Cir. 1929), cert. denied, 279 U.S. 858 [49 S.Ct. 353, 73 L.Ed. 999] (1929); when the price of Budweiser beer is dropped to match the price of 'non-premium' local beers, Anheuser-Busch, Inc., 54 F.T.C. 277, set aside for other reasons, 265 F.2d 677 (7th Cir. 1959), rev'd. 363 U.S. 536 [80 S.Ct. 1267, 4 L.Ed.2d 1385] (1960), again set aside for other reasons 289 F.2d 835 (7th Cir. 1961); and, when the price of a 'premium' automatic control is set above the price of less acceptable controls, Minneapolis-Honeywell Regulator Co., 44 F.T.C. 351, rev'd. on other grounds, 191 F.2d 786 (7th Cir. 1951), cert. dismissed, 344 U.S. 206 [73 S.Ct. 245, 97 L.Ed. 245] (1952)."

■ In other words, the Commission ruled that it cannot be determined whether there had been a "good faith" effort to meet the equally low price of a competing product without clear proof that petitioner's products were of "like grade and quality" [11] with that of the competition because it is always possible that, as in the previous FTC cases cited by the Commission, the public *was willing to pay more* for their products than those of competitors.

■ The Commission committed error on this point by equating "grade and quality" with "saleability." The two are not synonymous. It is obvious that the consuming public, being far less aware of such factors as "craftsmanship and materials" than professional carpetmakers, cannot easily discern differences in quality between comparable carpeting.[12] Furthermore, the public is greatly influenced by such intangibles as color, design, display, advertising, and similar factors. So long as petitioners conclusively show that their products at various price levels generate public demand (or "saleability") substantially equivalent to that of competitors' carpeting at the same price levels, considerations of "grade and quality" become unnecessary and indeed superfluous, for the most "grade and quality" can do is tend to show "saleability." See Balian Ice Cream Co. v. Arden Farms Co., 231 F.2d 356 (9 Cir. 1955). Moreover, the Commission completely ignored abundant unrebutted testimony in both cases which clearly demonstrated or would support the inference that petitioners' products at the various price levels possessed qualities of "saleability" comparable to that of its competitors' products. It also surprisingly ignored *substantial* evidence actually showing "like grade and quality." For instance, Mr. Brenner in the CC hearing said its carpets were "interchangeable" with those of the competition.

## II. "Formal Pricing System"

The Commission further ruled that by granting volume discounts, petitioners simply *adopted* a "formal pricing system" instead of meeting each individual competitive situation as it arose. Therefore, petitioners failed to show a "good faith" effort to meet a competitor's price. Implicit in the rationale of the Commission's opinion is the suggestion that Callaway and CC should have adopted a policy of lowering their prices on carpeting in a wholly piecemeal fashion, meeting the exact price at which any given competitor sold a certain type or style of carpeting to any particular customer. It relies on FTC v. Cement Institute, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948); FTC v. A. E. Staley Mfg. Co., 324 U.S. 746, 65 S.Ct. 971, 89 L.Ed. 1338 (1945).

■ We find this reasoning to be erroneous for the following three reasons. First, there is nothing wrong *per se* with *adopting* a "pricing system" used by competitors. Secondly, the Commission completely disregarded the realities of the

---

11. The phrase "like grade and quality" appears in Section 2(a) only; there is no reference to it in Section 2(b).

12. See footnote 10.

competitive conditions prevalent in the carpeting industry. Thirdly, the Commission failed to give proper consideration to the undisputed facts of the case.

It is important to examine in some detail the manner in which carpeting is sold. Each manufacturer makes a wide variety of carpeting of different quality to be sold by retailers at various "pricing points" which range from a low of $2.95 up to prices exceeding $49.95 per square yard in progressive increments of $1.00 per square yard. Often, there is a difference in construction, design, patterns, colors, or materials between carpets selling at the same price level, presenting an infinite variety from which customers may choose. All the different "styles" [13] or types of carpets taken together make up a manufacturer's "line." When one multiplies the broad number of styles with the number of manufacturers (approximately fifty to sixty), the number of different types of carpeting is quite large. According to the record, with minor exceptions, a retailer shows a manufacturer's "line" of goods to the public and then orders his requirements on a sale-by-sale basis. To price each style of its carpeting with specific reference to all the different styles of every competitive line, as suggested by the Commission, would require the petitioners to engage in *exhaustive* cost studies on the multitude of carpets on the market *before they are actually sold and before any discounts are given.* Such a procedure would be burdensome, unreasonable, and practically unfeasible. Even assuming petitioners could successfully forecast the prices at which their competitors were going to sell, they could not *possibly* determine how much each purchaser would buy during the year from each manufacturer in order to determine the size of the competitor's discount.

■■ As the Supreme Court said in FTC v. A. E. Staley Mfg. Co., supra, "the statute does not place an impossible burden upon sellers." In the circumstances and under the facts of this case, Callaway and CC could in "good faith" attempt to meet the competition by granting similar volume discounts especially since no workable alternative is evident.

■ We have found no authority which holds that in all circumstances the allowance of volume discounts according to a plan or "system" as distinguished from "individual competitive" responses is condemned per se. Clearly, this is not a "basing-point" case. FTC v. Standard Oil Co., 355 U.S. 396, 78 S.Ct. 369, 2 L.Ed.2d 359 (1958). It is only when no "reasonable and prudent person" would conclude that the adopted system is a reasonable method of meeting the lower price of a competitor that it is condemned. That decision must be made on a case-by-case basis. The adoption of the competitor's system in *Staley* and *Cement* had the effect of raising prices to certain purchasers through "phantom" freight charges and thus creating *greater* discrimination than necessary. Obviously, that was not a "good faith" effort. Such is not the case here. Under the totality of the circumstances, the discount system, *thoughtfully tailored by both petitioners to meet their individual problems in the market,* was a mature and reasoned approach to a very real and difficult competitive problem; and petitioners carried their burden of showing "good faith."

### III. Undercutting

■ In complete disagreement with the findings of the trial examiner and material, substantial and unrebutted evidence to the contrary, the Commission made the following statement in *Callaway:*

"It is no answer to contend, as do the respondents and the hearing examiner, that so-called 'old line' companies have a broader product line (i.e., both woven and tufted carpeting) and that respondents' qualifying purchase vol-

---

13. We use "style" to mean a carpet with a certain (1) material, (2) quality, (3) color, (4) pattern, etc.

umes must hence be lower. The plain fact is that respondents are offering lower net prices on an equivalent volume of purchases and this constitutes undercutting, not meeting, a competitor's prices."

Such is simply not the case, and we reject the Commission's conclusions as arbitrary. Minneapolis-Honeywell Reg. Co. v. FTC, 191 F.2d 786 (7 Cir. 1951). The evidence shows that Callaway sold less to its customers because it had a smaller, less expensive line; and, therefore, it had to lower its qualifying volumes so that a customer would receive the same percentage discount it would have received from a competitor from whom it would ordinarily be buying larger quantities, such additional quantities usually resulting from the fact that most competitors sold both woven and tufted lines. Furthermore, charts in the record reveal that the effect of the lower volume levels was to meet, not undercut the competition.[14]

## IV. "Price Lists"

Finally, the Commission ruled that CC failed to carry its burden under Section 2(b) because it failed to produce "price lists" comparing its net prices after discounts with those of the competition. It said:

"Stated otherwise, it is necessary, for us to compare the net prices offered by respondent with the net prices of its competitors which it was purportedly meeting to determine the existence of the requisite good faith. To accomplish this result, we must relate the discounts to the prices of comparable merchandise to determine whether respondent's net price was lower than those of competitor. Such a result is impossible without the price lists of respondent and its relevant competitors."

We disagree. CC need not show its prices were *in fact* equal to those of competitors, but must only show facts which would lead a "reasonable and prudent person" to believe that the granting of lower prices would in fact meet the

14. The difficulty inherent in meeting the volume discounts of competitors under the "meeting competition" defense was recognized by the Report of the Attorney General's National Committee to Study the Antitrust Laws, from which we quote:

"An incidental undercutting of the prices quoted by others, when in the course of genuinely meeting one particular competitor's equally low price offer, hence should not invalidate a seller's defense. At the same time, a seller responding to a rival's price should not be confined to quotations for a precisely equivalent quantity of goods." At p. 183

\* \* \* \* \*

"The Committee further believes that a seller should not be forced to meet a competitor's equally low price to the last fraction of a cent. Potent factors other than naked price determine a customer's choice among competing offers—especially with consumer goods reflecting a broad range of quality, design, or brand. While basic homogeneous commodities such as crude oil, steel and cement normally present slight problems of consumer differentiation, electrical appliances or chemicals, for example, involve a broad range of significant competitive factors other than price. Here

a mechanical test would defeat the objective of permitting a realistic equalization of an actual competitive situation. An inflexible cent-for-cent rule would enable a seller of the preferred commodity in fact to undercut the price for a less desirable product, or conversely, deprive the seller of a less popular product of the full benefit of the 'meeting competition' defense. We therefore urge a flexible rule which regards the nominal price of the rival product as only a presumptive boundary of a seller's permissible price reduction under the 'meeting competition' proviso, adjustable up or down upon satisfactory proof by the person questioning its reliability. In practical operation, such a test in some circumstances necessarily *must permit* a seller of a less accepted brand to cut substantially below the more popular product's price. Conversely, as the Commission has readily recognized, the seller of the premium commodity sometimes must not go down to the price level of the lesser product. In each case, the heart of the matter is whether actual competition, not merely a nominal price quotation, is equalized." At pp. 183–184

equally low price of a competitor. FTC v. A. E. Staley Mfg. Co., supra.

 Although he was fully credited as a reliable expert witness, Complaint Counsel suggests that the testimony of Vice-President Brenner of Cabin Crafts should be rejected because it was based on hearsay testimony or that his testimony was elicited by leading questions. We disagree. This witness was shown to be widely experienced in the industry over an extended period of years and to be thoroughly familiar with the commodities, market prices, trade practices, and the competitive problems involved. His testimony clearly established that Cabin Crafts is one of the small manufacturers which has undertaken to enter the carpet manufacturing business in recent years. For a number of years it offered no discounts but was constantly confronted with the demands of powerful purchasers to grant them in accordance with the industry-wide practice. It instituted the practice reluctantly and then only after its chief competitor, Callaway, commenced the practice. Even then Cabin Crafts did not permit chain stores to combine the purchases of all stores under common ownership as was ordinarily done. Its discounts were much less than those generally granted in the industry. In our view, the evidence sufficiently supports the 2(b) defense interposed by Cabin Crafts, and to hold otherwise would not only constitute a misinterpretation of the record but serious injustice would result. We conclude that CC had ample reason to believe that the granting of the discounts would only meet the competition.

A reading of all the records and briefs convinces us the Commission erred in its decision in these two cases and that such decisions should be reversed and the respective orders vacated. Although only four issues were raised and decided on this appeal, nothing herein should be accepted as either an affirmation or rejection of any of the other legal conclusions drawn by the Commission in its opinions.

The orders are vacated.