Tilden A. JONES, Plaintiff-Appellant,

v.

The BORDEN COMPANY, Defendant-Appellee.

No. 28278.

United States Court of Appeals, Fifth Circuit.

July 15, 1970.

Before WISDOM, GOLDBERG and INGRAHAM, Circuit Judges.

WISDOM, Circuit Judge:

Summary judgments in antitrust cases often are unadvisable. White Motor Company v. United States, 1963, 372 U. S. 253, 259, 83 S.Ct. 696, 700, 9 L.Ed.2d 738, 744. But in this treble damage action for price discrimination and exclusive dealing arrangements under the Robinson-Patman Act, the Borden Company has established by deposition and affidavit the nonexistence of exclusive dealing arrangements and the § 2(b) defense of meeting competition in good faith to the price discrimination charge. The plaintiff has not responded with affidavits and depositions or taken other steps to create any "genuine issue as to any material fact", Rule 56(c), Fed.R. Civ.P., and the record reveals no such issues. "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him." Rule 56(e), Fed.R.Civ.P.

I.

Tilden A. Jones bought a milk distributing business in Odessa, Texas, September 25, 1967. In this business he purchased milk products from Metzger Dairies and distributed and sold them to retailers. During 1967–68 eight dairies sold milk products in the Odessa area. In addition, two groups of stores—Safeway and 7–Eleven—had their own plants. But Jones's main competition was Borden, serving Odessa from its Midland plant through company-owned routes rather than a distributorship. The chief products in this market were homogenized milk and low-fat or "2% milk", both sold by the half-gallon. The mar-

W. R. Barnes, James M. O'Leary, Jr., Shafer, Gilliland, Davis, Bunton & McCollum, Odessa, Tex., for appellant.

F. H. Pannill, W. B. Browder, Jr., Midland, Tex., H. Blair White, J. A. Greaves, W. N. Braun, Chicago, Ill., for appellee; Stubbeman, McRae, Sealy & McLaughlin, Midland, Tex., Sidley & Austin, Chicago, Ill., of counsel.

ket was known as a "twenty percent market"—that is, the grocer generally received as his profit a twenty percent discount from the retail price.

These dairy products are distributed at a small profit per item. A distributor therefore must maintain a large volume of business to succeed. The amount of display space a grocer allows the distributor is of great importance because consumers tend to purchase the brand with the largest display.

Jones alleges that Borden paid discriminatory discounts or rebates to five main groups of retail outlets in Odessa and that it discriminatorily charged a lower price to one group of retail outlets by selling it a private label milk. As a result, these grocers allegedly enlarged Borden's display space at Jones's expense. Furthermore, Jones alleges that Borden sold milk to two groups of stores on the condition that they not deal in Metzger products.

By May 2, 1968, Jones's business was failing. He turned the distributorship over to one of its previous owners who operated it for a month longer, then finally shut it down completely.[1] Now Jones seeks treble damages for the loss of sales and the loss of his investment in the distributorship. He accuses Borden of violating the Clayton Act as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a) & (c).[2]

Borden responds that its discounting activities had no adverse effect on competition,[3] did not cause Jones's injury,[4] and, in any event, were protected by the § 2(b) defense that

> nothing herein contained shall prevent a seller rebutting the prima-facie case [of price discrimination] thus made by showing that his lower price * * * to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the serv-

1. Since June 1, 1968, the Metzger distributor who had operated as middle-man between Metzger and Jones after January, has operated in the Odessa area.

2. 15 U.S.C. § 13(a) & (c):

   (a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them:

      *     *     *     *     *

   (c) It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid.

3. In fact, Borden contends that its activities increased competition, because the Metzger distributor's discounts had driven it out of two stores and lowered its display space in others. Borden argues that uncontradicted evidence shows in every case that its space was simply increased to its proportionate share.

4. Borden argues that the true causes of Jones's injuries were Metzger's activities and misrepresentations by those from whom Jones purchased the distributorship. The evidence shows and Jones admitted that in 1968 Metzger raised its prices to Jones, stopped helping him on special discounts, and reduced his allowance for spoilage. There is also some evidence that Jones was not completely informed of his predecessor's business practices.

ices or facilities furnished by a competitor.

15 U.S.C. § 13(b). The exclusive dealing arrangements Borden denies outright.

On all these grounds, after the taking of depositions and the filing of affidavits, the district court granted Borden's motion for summary judgment. We agree with the district court that there is no "genuine issue as to any material fact" establishing the absence of exclusive dealing arrangements. Since we also find no "genuine issue as to any material fact" establishing the § 2(b) defense, we affirm the judgment without reaching the other issues whether Borden's activities had any substantial anti-competitive or monopolistic effect and whether Jones's injuries were caused by Borden or by Metzger's and his predecessor's activities.

## II.

A. *Exclusive Dealing Arrangements.*

Jones's contention, as taken from his brief on appeal, is as follows:

Prior to September 25, 1967, Borden loaned money to the owners of several retail stores in Ector County including three Tradeway stores. Payments were still being made on the debt when depositions were taken in the case. In February of 1968 appellant Jones solicited the owner of the Tradeway stores to permit him to display and sell Metzger dairy products in the Tradeway stores and he was refused permission.

In June of 1967 Borden commenced selling their products to Gibson's, a large discount store in Ector County. Gandy's milk had been in the Gibson's store up until the time Borden took over. Borden gave Gibson's a 5% rebate in addition to the 20% that was in the market and went into the store to the exclusion of all other brands of milk. The excuse given by appellee granting Gibson's the 5% rebate in addition to the 20% discount was that Gandy milk had furnished the dairy department equipment to Gibson's while it was in the Gibson's store and, since Gibson's was installing its own dairy equipment at the time Borden took over, the 5% rebate was allowed as the equivalent to furnishing the dairy equipment. In the latter part of February of 1968 appellant solicited the management of Gibson's to display and sell Metzger dairy products in the Gibson's store and permission was denied.

■ Such an exclusive arrangement could involve both a violation of Section 2(a) and Section 2(c) of the Clayton Act as amended by the Robinson-Patman Act. * * *

Thus, Jones has abandoned on appeal his original contention that these were exclusive dealing arrangements in violation of 15 U.S.C. § 14. This abandonment is understandable, for the uncontested affidavits of the Borden representative and the Tradeway manager explicitly deny the existence of an exclusive dealing arrangement. The Tradeway manager stated that Tradeway handled only Borden milk because Tradeway had only limited display space and Borden had good customer acceptance. Jones himself acknowledged that the Tradeway manager had told him nothing of any such arrangement but had said only that he was happy with Borden and would talk to Jones "if the situation warranted a change". There is no other evidence.

Similarly, with regard to Gibson, the Borden representative and the Gibson owner have stated unequivocally the absence of an exclusive dealing arrangement. Again, no evidence contradicts this position. Jones admits that he was told nothing of such an arrangement. When he talked to the owner about servicing the store, the owner told him to see the grocery manager. The grocery manager told Jones to see the owner. Therefore, Jones ceased trying to sell milk to Gibson's, concluding that he "was getting the run-around".

What Jones does contend now is that Borden violated § 2(a) and (c) of the Robinson-Patman Act. Section 2(a), prohibiting price discrimination, is subject to the § 2(b) defense of meeting competition. We discuss Borden's defenses under this section in the next part of this opinion. Section 2(c) prohibits the paying or granting of "anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof". It is very difficult to see how the arrangements here could fit into the pseudo-brokerage or even commercial bribery arrangements that Congress sought to curtail through § 2(c). Rangen, Inc. v. Sterling Nelson & Sons, 9 Cir. 1965, 351 F.2d 851, 856. At any rate, the uncontested affidavits that no such arrangements existed sustain the grant of summary judgment in this respect.

### B. *The § 2(b) Defense.*

■■ Jones argues that Borden's § 2(b) defense does not justify summary judgment because "justification by and the good faith of the appellee in its actions is but a question of fact". The statement is unobjectionable but it does not prove that summary judgment was incorrectly granted. It is true that Borden has the burden of making out its § 2(b) defense. But it succeeds in establishing the facts to make out the defense, then § 2(b) "afford[s] an absolute defense to a charge of violating § 2(a), notwithstanding the existence of the statutorily prohibited anticompetitive effect". FTC v. Sun Oil Company, 1963, 371 U.S. 505, 514, 83 S.Ct. 358, 9 L.Ed.2d 466, 475. Thus, the question we must resolve is whether there are any "genuine issue[s] as to [the] material fact[s]" which Borden must develop to sustain its defense.

According to the Supreme Court,

Section 2(b) does not require the seller to justify price discriminations by showing that in fact they met a competitive price. But it does place on the seller the burden of showing that the price was made in good faith to meet. a competitor's. The good faith of the discrimination must be shown in the face of the fact that the seller is aware that his discrimination is unlawful, unless good faith is shown, and in circumstances, which are peculiarly favorable to price discrimination abuses. We agree with the Commission that the statute at least requires the seller, who has knowingly discriminated in price, to show the existence of facts which would lead a reasonable and prudent person to believe that the granting of a lower price would in fact meet the equally low price of a competitor.

FTC v. A. E. Staley Manufacturing Company, 1945, 324 U.S. 746, 759–760, 65 S.Ct. 971, 977, 89 L.Ed. 1338, 1347. We summarized that burden as follows:

[A defendant] need not show its prices were *in fact* equal to those of competitors, but must only show facts which would lead a "reasonable and prudent person" to believe that the granting of lower prices would in fact meet the equally low price of a competitor.

Callaway Mills Company v. FTC, 5 Cir. 1966, 362 F.2d 435, 443–444.

The uncontradicted evidence here shows that the Metzger distributor from whom Jones purchased the business had been granting a two-cent discount (above and beyond the twenty percent in the market) on every half-gallon of milk. One of Jones's predecessors stated by affidavit that since February 1967 the business had granted the discount to the Everybody Stores, the Bill Sears Stores, the A. L. Davis Stores, and two small independent grocers. The testimony of another partner indicates another discount originating even earlier. In return, Everybody and Davis did not handle competing brands of 2% milk. (In June 1967 the two-cent discount was changed to a discount of 1½ percent of the gross sales per month.) Everybody's owner stated by affidavit that when he received this discount he discontinued Borden's 2% milk not to restock it until six months later when

Borden granted Everybody a discount. At Davis, Borden's display space was reduced and its sales fell sharply.

According to the affidavit of Charles Blythe, owner and operator of Everybody's Stores, C. W. Beasley of Borden inquired in August 1967 why he was not handling Borden's 2% milk.

> I informed him that it was a confidential matter. Mr. Beasley then asked whether Borden's was competitive and I informed him that it should be obvious that Borden was not competitive. Mr. Beasley then asked whether a 5% discount would make Borden competitive with the price I was paying for Metzger milk. I informed him that that would be about right.

Beasley, Borden's Midland District sales supervisor, gave the same account of the conversation. With that background, Borden granted Everybody a five percent discount September 7, 1967.

Then Borden's Midland Sales Manager inquired of Piggly Wiggly Stores whether Borden was competitive. The Vice-President of Shop-Rite Foods, the Piggly Wiggly operator in Odessa, informed him that Borden was generally five percent higher than Metzger. Borden thereupon also gave Piggly Wiggly a five percent discount in September.

The Midland Sales Manager next extended his inquiry to Furr Super Markets. There a supervisor informed him that Metzger always undersold Borden. Again, Borden granted the discount. Sears Stores were next to receive the discount. Finally in December, Borden discovered that it was not competitive in the A. L. Davis Stores, and granted the discount there.

With regard to the special rate Borden advanced on the private label it furnished Furr, the record is equally devoid of evidence to contradict Borden's defense. Furr's Senior Vice-President stated by affidavit that the Furr group decided a private label was necessary to compete with other private label milk such as Safeway's and Gibson's. In 1967 Furr Foods requested bids on supplying a private label from several companies. Borden bid for the contract, was underbid by at least two other dairies, but was selected because of its convenient location and consequent dependability.[5]

Finally, on the discount to Gibson, the only evidence is the testimony of Borden's General Manager for the Midland area. He testified on deposition that Gibson approached Borden to see what price it would offer. Since Gandy Dairies was then servicing Gibson and providing refrigeration equipment as well, Borden concluded it would have to grant a five percent discount in order to be competitive without the equipment. No evidence contradicts this position.

On all these issues, as in *Callaway Foods*, we conclude that Borden did carry its burden of showing good faith in its conclusion that it must lower its prices to meet the competition. Borden goes to great mathematical lengths in its brief to work out the consequences of the various discounts to show that in no case did its price drop below those the Metzger distributorship was offering. We do not rely on that factor, however, for two reasons: In *Callaway Foods*, we disclaimed a requirement of exact accuracy and tested the discounts by the standard of a "reasonable and prudent person" attempting to meet his competitor's prices; Borden's failure to drop its prices below Metzger's would not amount to a § 2(b) good faith defense if in fact its motives were to undercut the competition.

It is true that "[w]e look at the record on summary judgment in the

---

5. Borden also provides lesser services for a private label than it does for milk under the Borden label. Furr must order in advance the quantity of milk it desires and receives no credit for returns or spoilage. And instead of servicing the display space on a daily schedule, the Borden drivers simply place the milk in a storage vault. Furr employees must look after stocking the display area.

light most favorable to * * * the party opposing the motion". Poller v. Columbia Broadcasting System, 1963, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458, 464. But in this collection of depositions and affidavits from the plaintiff Jones, his predecessors in the Metzger milk distributorship, Borden's general manager for the Midland area, and owners and management personnel from the retail outlets, we are unable to discover any refutation by Jones of Borden's defense. And Jones's brief on appeal does not point out the conflicts in the evidence.

■ Finally, we are cognizant of decisions in this Circuit rejecting summary judgment in cases "where motive, intent, subjective feelings and reactions, consciousness and conscience [are] to be searched, and examination and cross-examination [are] necessary instruments in obtaining the truth". Alabama Great Southern R. R. v. Louisville & Nashville R. R., 5 Cir. 1955, 224 F.2d 1, 5; *see* NLRB v. Smith Industries, Inc., 5 Cir. 1968, 403 F.2d 889, 893; Riley-Stabler Construction Company v. Westinghouse Electric Corporation, 5 Cir. 1968, 401 F.2d 526, 527. But the best procedure "for a correct understanding of summary judgment [is to rely] on the text of the rule, rather than on quotable statements made in one or another case". 3 W. Barron & A. Holtzoff, Federal Practice and Procedure § 1232.2 at p. 114 (C. Wright ed. 1958). In examining whether Borden met its burden of showing its good faith in the § 2(b) defense, we observe that Jones had full opportunity to muster all the evidence he could, that he deposed Borden's general manager for the Midland area, and that he did not file an affidavit showing why he could "not for reasons stated present by affidavit facts essential to justify his opposition" to the motion for summary judgment, Rule 56(f), Fed.R.Civ.P. In the absence of any evidence to question or contradict Borden's good faith, we conclude that the district court properly granted the motion. *See* Miles v. Dick-

son, M.D.Ala.1966, 40 F.R.D. 386, aff'd in part, rev'd in part, 5 Cir. 1967, 387 F. 2d 716; Moran v. Bench, 1 Cir. 1965, 353 F.2d 193, cert. denied, 1966, 384 U.S. 906, 86 S.Ct. 1341, 16 L.Ed.2d 359.

The judgment is affirmed.