Kenneth J. HAMPTON, d/b/a Hampton Vending Supply, Plaintiff-Appellant,

v.

GRAFF VENDING COMPANY et al., Defendants-Appellees.

No. 72-3276.

United States Court of Appeals, Fifth Circuit.

May 9, 1973.

Rehearing Denied June 11, 1973.

James L. Branton, San Antonio, Tex., for plaintiff-appellant.

Earl Luna, Dallas, Tex., for defendants-appellees.

Before TUTTLE, THORNBERRY and DYER, Circuit Judges.

DYER, Circuit Judge:

Hampton brought this action under section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C.A. § 13(a),[1] claiming that Graff Vending Company had illegally lowered its prices in the San Antonio and Houston areas. The district court found that Graff's actions did not have the effect of substantially lessening competition, that they did not operate to discriminate against Hampton, and that Graff acted reasonably to meet competition; pursuant to these findings judgment was entered for Graff and Hamp-

---

1. Section 13(a) provides in pertinent part:
(a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them. . . .

ton appealed. Because we are of the view that Hampton successfully established a case of primary line price discrimination as to some of Graff's activities, we reverse.

## I. Facts

The basic facts are essentially undisputed. Because the application here of the correct principles of law requires an understanding of the competitive situation, however, we must set out an accurate description of the market involved.

Both Hampton and Graff expend their profit making efforts in what is known as the bulk vending supply business. This business consists of the sale of ball gum and charms and of the sale of vending machines through which the gum and charms are sold to the public. The distributive channels for these products are not uniform throughout the industry, but frequently the items are sold by the manufacturer to a functional wholesaler, who in turn resells them to an operator who actually places and fills the machines at their retail locations in grocery stores, gas stations, etc. Additionally, certain wholesalers function partially as operators and certain large operators buy direct from some manufacturers.

Graff, according to its own advertising, is the world's largest bulk vending distributor, with its home office in Dallas, Texas. It has outlets in many states and has several warehouses in Texas, including ones in San Antonio and Houston. Graff functions primarily as a wholesaler, but does operate some retail routes in other parts of the country and does own some retail routes in San Antonio.[2] The source of most of Graff's gum is W. R. Grace Company of Chicago, Illinois, which manufactures Leaf gum. Graff serves as the almost exclusive distributor of Leaf gum in Texas and purchases at list price less 19% and less some freight allowances.

Hampton's functional role is not as easily characterized and must be viewed, to some extent, historically. Since 1965 Hampton has been an operator of vending machines in the San Antonio area. Sometime in 1969 he became an employee of Graff and ran its San Antonio office, in addition to continuing his own business as an operator. At the end of 1970 Hampton quit working for Graff and added a wholesale element to his business reselling some gum to other operators. From early 1971 to the present, Hampton has maintained this functional stance, working primarily in the San Antonio—south-Texas area with occasional sales to other parts of Texas and to other states.

The heart of this controversy concerns Hampton's source of gum and the price paid for it. When Hampton left Graff's employ and began wholesaling as well as operating, he purchased his gum through his father, who had a large volume contract with Graff. Under this contract Hampton's father purchased Leaf gum from Graff at list price less 10% and he passed this price on directly to his son. Hampton in turn used some of this gum on his own routes and resold the rest to various operators at list.

During 1971 and into the first months of 1972, while Hampton was functioning both as an operator and a wholesaler, Graff experienced a steady decrease in sales in the San Antonio and Houston areas. In February 1972, in the midst of these decreased sales, Graff's contract with Hampton's father came up for renegotiation and Graff decreased the discount it would offer on Leaf gum from 10% to 8%. Hampton's father would not purchase from Graff at this rate and the contractual relationship, and Hampton's source of gum, terminated on May 15, 1972. Efforts by Hampton to negotiate a satisfactory contract with Graff directly also failed.

2. Although Graff had operated some routes in San Antonio 2 or 3 years prior to this suit, it now just owns the master contract with several grocery store chains in the city; other people, who purchase supplies from Graff, actually work these routes.

With his source of Leaf gum becoming less attractive Hampton looked elsewhere for gum and contacted American Gum Company. This led to his placing a 1000 case order with American at a price of list less 17% and freight allowances. Because the list prices for American and Leaf gums were approximately equal, this price constituted a substantial savings over the price he previously paid to Graff via his father.[3]

Shortly after Hampton contracted with American, Graff implemented a previously arranged sale on Leaf gum[4] for all sales out of its San Antonio and Houston offices. This sale was supported by Leaf who had been asked for help in these two marketing areas[5] and who had agreed to lower prices to Graff by $1.50 per case on some gum and by $.90 per case on other gum if Graff would pass the savings along. The resulting price at which Graff would sell to anyone, including small operators, was approximately equal to the price American charged Hampton. Correspondingly, Hampton's resale price to operators was now considerably higher than Graff's resale price to operators.[6]

The impact of Graff's new price structure was almost immediate. Its sales recovered sharply from their year and one-half slide and Hampton's sales dropped from previous months. Hampton then filed this suit.

### II. The Court Below

Hampton's argument below was tied completely to his status as a wholesaler and a direct competitor of Graff. As a result, he attempted to show a case of

---

3. From the record, the following is an example of the per case price that Hampton paid to Graff prior to May 15, 1972, and to American after that date.

| Gum | Mfg's list, No. 933 ball gum | Hampton's cost |
|---|---|---|
| Leaf * | $ 9.70 ** | $8.73 (list less 10%) |
| American * | $10.15 | $7.73 (list less 17% and frt.) |

\* The per case price is not exactly comparable because a Leaf case has a 5550 count and an American case has a 5670 count.

\*\* The list price of one case of Leaf No. 933 ball gum increased from $9.40 to $9.70 on March 15, 1972. Other Leaf products increased in price at the same time.

---

4. Hampton's complaint alleged that Graff had cut its price in all areas of sales—gum, charms, and machines. It is clear from the record, however, that he only adduced evidence concerning alleged price discriminations with respect to Leaf gum. Consequently, it is on this ground alone that Hampton must prevail, if at all.

5. Graff asked for these price reductions only for San Antonio and Houston, despite the fact that it was experiencing decreased sales in at least several other major marketing areas.

6. The following is an example of the prices available to a small operator in San Antonio after the beginning of Graff's sale.

Case of No. 933 Ball Gum

| Seller | List | Discounts | Costs | Price |
|---|---|---|---|---|
| Graff/Leaf | $ 9.70 | 1.50 + 19% + frt. | $5.95 | $8.20 |
| Hampton/American | $10.15 | 17% + frt. | $7.73 | $9.74 * |

\* Hampton sold a case of American No. 933 ball gum at below list to make the gum more competitive with Leaf gum from Graff, which had been sold at list price prior to the sale in question.

primary line discrimination.[7] Graff, on the other hand, seemed to prefer to view the case as a secondary line case, and then in turn met this argument with the assertion that its lower prices were available to everyone, including Hampton. In the alternative, it argued that its lower prices were justified as a good faith effort to meet competition (said to be that of American) and to regain Hampton and others as customers.

The district court, faced with a complex case involving businesses functioning at more than one level of distribution, framed its findings of fact and conclusions of law in terms of a secondary line case and entered judgment for Graff. While we feel that some of Graff's contentions have merit, we conclude that they must be reevaluated in light of Hampton's primary line argument.

### III. Prima Facie Case of Primary Discrimination

The presence of most of the requisite elements in Hampton's case was not questioned below and has not been questioned here. Three elements, however, merit our attention—Hampton's status as a functional competitor, the existence of price discrimination, and the effect on competition.

■ Hampton's role as a competitor wholesaler is obscured by two other relationships he had with the San Antonio market. First, until just prior to this suit, he had been a customer of Graff. Nevertheless, that position does not bar him now from asserting rights incident to his functional position. In fact, the record clearly shows that even when he was a customer of Graff, he was able to compete successfully with Graff for wholesale business. Furthermore, in his current position, he is a completely independent competitor.

The second relationship Hampton has with the current market that belies his status as a wholesaler is his continuing business as an operator. Graff has not suggested that this in any way bars Hampton from suing as a wholesaler and the fact that 90% of Hampton's business is wholesale indicates that this is his true position in the distributive scheme. We, therefore, consider him to be a functional competitor of Graff.

■ The occurrence of price discrimination is more easily discerned. Graff readily admitted that it requested support from Leaf for its price cut only for the San Antonio and Houston areas. At its offices throughout the remainder of Texas and in other states, Leaf gum continued to be sold at list price. The fact that within these two Texas markets the prices were the same to all customers is irrelevant. "[A] price discrimination within the meaning of [section 2(a)] is merely a price difference," FTC v. Anheuser-Busch, Inc., 1960, 363 U.S. 536, 549, 80 S.Ct. 1267, 1274, 4 L. Ed.2d 1385, and Hampton has shown and Graff has admitted a geographic price difference.

■ The final element about which there could be a question is whether the effect of Graff's actions "may be to substantially lessen competition." In considering this, we are first met with the district court's finding that the sale "would not" have that effect. This finding, however, is not entitled to the mantle of protection normally afforded district court findings under Rule 52(a), Fed.R.Civ.P., because the court's findings had obvious reference to a case of secondary line discrimination. While we have no quarrel with the finding in that

<hr>

7. An injury to the primary line of commerce is one that affects competition among sellers. It was the subject of the first federal statute dealing exclusively with price discrimination and is still covered by the Robinson-Patman Act. *See* FTC v. Anheuser-Busch, Inc., 1960,

363 U.S. 536, 542–543, 80 S.Ct. 1267, 4 L. Ed.2d 1385. It differs from secondary line price discrimination in which competition is usually affected because some customers of a seller do not receive prices as low as certain "favored" customers.

context, it is in no way binding on us when the case is properly construed as primary line discrimination. *See* Shultz v. First Victoria National Bank, 5 Cir. 1969, 420 F.2d 648. *See also* United States v. Singer Manufacturing Co., 1963, 374 U.S. 174, 194 n. 9, 83 S.Ct. 1773, 10 L.Ed.2d 823; Manning v. M/V "Sea Road", 5 Cir. 1969, 417 F.2d 603.

When the discrimination alleged here is evaluated at the wholesale level the deleterious impact on competition becomes apparent. This is exemplified by Hampton's personal situation. Before Graff's sale, for example, he was able to purchase his No. 933 gum from American at $7.73 per case and was selling it at $9.74. Graff's corresponding figures were $7.40 and $9.70. Given some difference in the quantity in each case (*see* footnote 2), the prices were roughly comparable, and this resulted in a competitive market based largely on the quality of the wholesaler's service.

This relationship was shattered when Graff requested and received an additional discount of up to $1.50 per case, which allowed it to purchase an identical case of No. 933 Leaf gum at $5.95 and to sell it at $8.20.[8] To meet this price Hampton, or any other competing wholesaler, would have to lower his resale price almost to the level of his cost of acquisition. In Hampton's position that would reduce gross income before costs to approximately $.50 per case.[9] From the testimony of Graff's director of sales and marketing, it is apparent that no wholesaler could continue to compete with only that amount of markup.[10]

Although the above comparison was made only between Hampton's and Graff's prices, we are not unaware that the Robinson-Patman Act is concerned primarily with possible injury to *competition* and not to *competitors*. *See* Borden Co. v. FTC, 5 Cir. 1967, 381 F.2d 175. Our review of the record, however, reveals no existing, or potential, wholesale competitor in the San Antonio area who was able to compete, or would be able to compete, with Graff's sale prices. Certainly, no wholesaler purchasing from Graff could hope to resell at a profit because Graff offered the sale price to everyone and granted no discounts whatsoever off that price. Similarly, the evidence indicates that American had no instituted price system to match Graff's price on Leaf gum and thus no wholesaler could compete by purchasing from that source. Leaf also was unavailable as a direct source of reduced price gum because Graff received a very special concession for this sale and because Graff had a virtually exclusive distributorship of Leaf products in Texas. Finally, although other companies manufacture comparable gum, the evidence indicated no substantial competitive activity by them in the San Antonio area before the sale, much less during it.

Consequently, we are confronted with a wholesale gum market in which, immediately following the price cut, Graff in-

---

8. The facts of this case differ from those of several other primary line cases in that the geographic price difference here was not absorbed by the discriminator, but was underwritten by the manufacturer at the discriminator's request. This has not been raised as a distinguishing factor and, where a large national wholesaler is able to request and receive this kind of preferential treatment, the potential force of any such argument is lost.

9. There is some indication in the record that, on many sales, Hampton's gross income would be still less. According to Hampton's trial brief, in addition to overhead expenses, he has to pay the freight on his shipments to non-local customers while Graff does not. This one item, claims Hampton, increases his cost on over one-half of his delivered cases of No. 933 American gum from $7.73 to $8.18 a case.

10. Mr. Goldstein stated that Graff could not maintain the sale price ($8.20 per case on No. 933 gum) if it were required to revert to its old price schedule from Leaf ($7.40 per case); this would yield a maximum of $.80 per case, and, with other costs and overhead included, would allow no more than a few cents profit on a case. According to Mr. Goldstein, such a profit level is insufficient to support a continuing wholesale business.

creased its market share by as much as 50% and Hampton's share dropped approximately 39%. Therefore, with no definable end for the sale in question and with no viable wholesale competitor in the area, we conclude, after a careful review of the record, that there is both a reasonable possibility, and a reasonable probability,[11] that the effect of Graff's reduced prices on Leaf gum products may be to substantially lessen competition.

### IV. Defense Against Prima Facie Price Discrimination Case

■ The showing that Hampton was Graff's functional competitor, that price discrimination occurred, and that it resulted in the proscribed effect on competition does not constitute an irrebuttable violation of the Robinson-Patman Act. Instead, the Act allows a person against whom a prima facie case has been established to justify his actions by raising any of three affirmative defenses built into the Act itself. The chief defensive effort by Graff that retains any validity in a primary line case [12] is aimed at the so-called "good faith meeting competition defense" incorporated in section 2(b) of the Act.[13]

■ The section 2(b) defense, if proved, does constitute an absolute defense to a prima facie price discrimination case, regardless of the anti-competitive effect shown to exist. Jones v. Borden Co., 5 Cir. 1970, 430 F.2d 568. The

burden of proving the defense, however, is squarely on the price discriminator, see Surprise Brassiere Co. v. FTC, 5 Cir. 1969, 406 F.2d 711, and it is a burden that is not easily met. For Graff to prevail on this point the record must at least demonstrate "the existence of facts which would lead a reasonable and prudent person to believe that the granting of a lower price would in fact meet the equally low price of a competitor." FTC v. A. E. Staley Manufacturing Co., 1945, 324 U.S. 746, 759–760, 65 S.Ct. 971, 977, 89 L.Ed. 1338, see Callaway Mills Co. v. FTC, 5 Cir. 1966, 362 F.2d 435.

Perhaps the most fundamental element of the defense is that the price met must be that of a competitor. In a primary line case such as this, it would be reasonable then for Graff to try to show that Hampton's prices, or those of some other wholesaler, were lower than its own and that it tried to match them. For the period from January 1971 to May 15, 1972, Graff has failed to do this. During that time Hampton purchased from Graff and resold at exactly the same price that Graff sold directly to operators. No other wholesaler was shown to have sold at a lower price during this period.

After May 15, 1972, Graff has at least shown that, among local wholesalers, Hampton sold American gum at a price somewhat below Graff's price for Leaf gum. This small difference, however, attributable to more gum balls being

---

11. *Compare* FTC v. Morton Salt Co., 1948, 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196, *and* Borden Co., *supra with,* Foremost Dairies, Inc. v. FTC, 5 Cir. 1965, 348 F.2d 674, 680 n. 11, cert. denied, 382 U.S. 959, 86 S.Ct. 435, 15 L.Ed.2d 362.

12. Based on the findings of the district court, Graff has continued to assert that no discrimination occurred because the sale price was available to Hampton. This secondary line argument carries no weight in a primary line case.

13. Section 2(b) of the Act, 15 U.S.C.A. § 13(b) provides:

Upon proof being made, at any hearing on a complaint under this section, that there has been discrimination in price or services or facilities furnished, the burden of rebutting the prima-facie case thus made by showing justification shall be upon the person charged with a violation of this section, and unless justification shall be affirmatively shown, the Commission is authorized to issue an order terminating the discrimination: *Provided, however,* That nothing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor.

packed in an American case than in a Leaf case, is completely insufficient to justify price cuts of $1.50 and $.90 for certain kinds of Leaf gum.[14]

Therefore, most of Graff's effort at establishing a competitive relationship for section 2(b) purposes was not directed at San Antonio wholesalers, but at American itself. As unusual as this approach is in a primary line case, it is not without merit. The reason is that, although Hampton did compete with Graff as a wholesaler throughout this period, he had also been a substantial customer of Graff until May 1972. As such, it would be unreasonable for us to bar Graff completely from using the 2(b) defense in this special situation. where a former customer had been induced away by a manufacturer otherwise competing with Graff's supplier.

The competitive relationship thus established is merely the first step in claiming the protection of this defense. Graff is still required to prove that its prices, within reasonable limits, were just low enough to meet but not beat the competitive price. *Jones, supra*, 430 F.2d at 573; *Callaway, supra*. In this respect, as we demonstrate hereinafter, Graff has failed to show a good faith effort to meet American's prices.

It is clear from the record that Hampton purchased gum from American at list less 17%. This fact alone does not justify the sweeping price cuts on Leaf products to all purchasers, however. Graff has shown no other sales by American to San Antonio purchasers at prices below Leaf's list price and no sales, other than American's to Hampton, at anything approaching $1.50 off the list price on a case of gum. Despite the absolute lack of such evidence, Graff

now claims that it was justified in offering the reduced prices to all purchasers in San Antonio, large or small, wholesaler or operator. We conclude that this was an unreasonable competitive tactic.

Although the exact details of American's pricing schedule are not before us, it is beyond question that Hampton was able to receive his 17% discount only because he made a large volume order. This quantity discount approach was not foreign to the industry; both Graff's director of sales and marketing and its San Antonio area representative testified that they knew American would only sell at a discount similar to Hampton's if the purchaser made a volume purchase of upwards to 20–25 cases.[15] Nevertheless, possessing a generally accurate picture of its competitor's sales policy and well aware that it itself only gave discounts to volume purchasing accounts, Graff lowered its prices to approximately the level Hampton got from American and then offered these prices to all, including the smallest operator able to purchase only one case at a time.

To suggest that such a sales policy was a good faith, reasonable effort to meet competition is unthinkable. Graff, who might have engineered a carefully drawn sales compaign to regain the business of Hampton and perhaps any other customers lost to American, instead resorted to a severe price cut which, contrary to the normal practice in the industry, gave to the small operator the price offered by American only to quantity purchasers. *See* FTC v. Standard Brands, Inc., 2 Cir. 1951, 189 F.2d 510. We conclude that Graff has not established a good faith meeting competition defense within the meaning

---

14. For example, Hampton sold a 5670 count case of No. 933 American gum for $9.74. At that price level, Graff would have been justified in lowering the price, to operators, on its 5550 count case from $9.70 to $9.53—a total of $.17. Even when some amount is added for a reason-

able uncertainty over Hampton's exact prices in a competitive situation, the technically allowed cut of $.17 cannot grow to $1.50.

15. Hampton testified that he was required to place a 100 case order to get the 17% discount plus freight.

of section 2(b) of the Robinson-Patman Act.[16]

### V. Available Relief

In his original complaint, Hampton requested damages, costs, a reasonable attorney's fee, a preliminary injunction, and "such other and further relief as is just." After obtaining a preliminary injunction, he was denied all requested relief including a permanent injunction. Because we have found that he proved a prima facie case and that Graff did not successfully establish a 2(b) defense, we must consider what relief is now appropriate.

■ Hampton's counsel at oral argument urged that we remand the case so that the district court could receive further evidence on damages; in the alternative he urged that the case be remanded so that the district court could make a finding on damages based on the record as it presently stands.

Because the proceeding below was a full hearing on the merits, Hampton's first position is utterly without merit. His second position is also untenable. Near the close of the hearing the following exchange occurred between the court and Hampton's counsel.

THE COURT: I don't think there is any proof of loss, as to the amount of loss of damages or earnings at this time. Now, it may be that before Mr. Branton rests, there will be. But at the present time I don't think he has established any damages. Have you, Mr. Branton? I haven't heard any figures mentioned.

MR. BRANTON: I don't think I have. I think we have established that he has suffered a loss and that there is a decline in his business, but there is no—

THE COURT: But there is no evidence. I haven't heard any figures mentioned or anything. I think we are prolonging this thing.

Hampton thereafter introduced no further evidence and has not demonstrated to this court any compelling reason, in the record or otherwise, for us to ignore his admission. Hampton must have felt that his proof had failed to nail down clearly ascertainable damages or that it was impossible to place a dollar value on them. Since upon a full trial there was a failure of proof of actual damages, that is the end of the matter.

■ That there is no entitlement to damages, however, is not dispositive of the question of permanent injunctive relief. Authorized under 15 U.S.C.A. § 26, a permanent injunction can be issued by a federal district court exercising equitable jurisdiction because it has "broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future unless enjoined, may fairly be anticipated from the defendant's conduct in the past." Zenith Radio Corp. v. Hazeltine Research, Inc., 1969, 395 U.S. 100, 132, 89 S.Ct. 1562, 1581, 23 L.Ed.2d 129, quoting NLRB v. Express Publishing Co., 1941, 312 U.S. 426, 435, 61 S. Ct. 693, 85 L.Ed. 930. In the present posture of this case, however, the initial determinations of whether an injunction should issue, and what its scope should be if issued, are peculiarly within the competence of the district court and we intimate no predisposition on either question. We, therefore, remand this aspect of the case for a reevaluation of the record with respect to possible injunctive relief.

16. The district court's findings to the effect that Graff's sale was a reasonable way to meet competition and that Graff's prices were not unreasonably low are not binding on us when the case is properly viewed as primary line discrimination. Furthermore, because Graff has failed to prove a 2(b) defense, we need not consider whether Graff's price cuts were a proper response to individual competition situations, or whether the new price structure was an illegal plan or system for meeting competition. *Compare Callaway, supra, with Surprise, supra.*

The final relief prayed for was a reasonable attorney's fee and costs, in accordance with 15 U.S.C.A. § 15. Such relief is addressed to the sound discretion of the district court and, under the facts of this case, we think it appropriate for that court to examine the question first. *See* Poster Exchange, Inc. v. National Screen Service Corp., 5 Cir. 1970, 431 F.2d 334, cert. denied, 1971, 401 U.S. 912, 91 S.Ct. 880, 27 L.Ed.2d 811.

We reverse and remand for further proceedings not inconsistent with this opinion.

Reversed and remanded.