**Aubrey D. HANSON d/b/a Hanson Paint & Glass Company, Plaintiff-Appellee,**

v.

**PITTSBURGH PLATE GLASS INDUSTRIES, INC., Formerly Pittsburgh Plate Glass Company, Defendant-Appellant.**

No. 72–2136.

United States Court of Appeals, Fifth Circuit.

June 25, 1973.

Rehearing Denied Aug. 14, 1973.

Tom S. Milam, Lubbock, Tex., Smead, Roberts, Harbour, Smith, Harris & French, Longview, Tex., John P. S. O'Connor, Cyrus V. Anderson, Pittsburgh, Pa., for defendant-appellant.

Scott Baldwin, Carl R. Roth, Marshall, Tex., for plaintiff-appellee.

Before GOLDBERG, AINSWORTH and INGRAHAM, Circuit Judges.

AINSWORTH, Circuit Judge:

In this Robinson-Patman price discrimination action, defendant Pittsburgh Plate Glass Company [1] appeals from a judgment in favor of plaintiff Aubrey D. Hanson. We hold that the district court erred in denying defendant's motions for a directed verdict and for judgment notwithstanding the verdict, and reverse.

Hanson entered the glass industry at the age of 22 when he worked for PPG

1. Since suit was filed, the name of the company has been changed to P.P.G. Industries, Incorporated.

as a glass cutter in Shreveport, Louisiana, in 1927. Three years later he became a PPG salesman in Northwestern Louisiana, Eastern Texas, Southeastern Oklahoma, and Southwestern Arkansas. In 1946, he established an independent glass retail business in Marshall, Texas. The business made an average profit of $12,892 for the years 1948 to 1955, but then sustained losses in each succeeding year except for small profits of $613 in 1958 and $204 in 1964.

Hanson's financial problems began when a new glass retailer, Martex Glass Company, opened in 1952 as a direct competitor in Marshall.[2] Martex became a recognized distributor of Shatterproof Glass Corporation, entitling it to greater discounts than were generally available to Hanson. For example, Shatterproof offered its auto glass to Martex at a discount of about 68 per cent. PPG offered auto glass to Hanson at a discount of about 55 per cent. Another glass distributor, Safelite Glass Corporation, undersold PPG by offering auto glass to all retailers at a discount of about 60 per cent. When Hanson's business began to decrease, PPG reassessed the situation in an effort to rebuild its volume of sales. PPG decided to approach Martex and offer it the lowest PPG published price, namely, the discount currently available in Marshall only to Hanson. But Martex declined and explained that the glass could be purchased at a lower price from other sources. As a result, on May 4, 1964, the PPG district manager in Shreveport authorized its salesman to "meet the prices being quoted by Safelite Glass Corporation of Dallas, Texas, to Martex Glass Company of Marshall, Texas." However, PPG continued to follow its own published list in selling to Hanson. Hanson continued to buy from PPG but purchased most of his inventory from Safelite and other suppliers.

Hanson's debts with various creditors increased as his business declined. He was indebted to the bank, did not pay his rent for five or six months, and postdated his checks. After Hanson fell behind on his account for an amount in excess of $1,000, Safelite discontinued its business with him in 1965. By 1968, Hanson also owed substantial sums to his other suppliers, PPG and Binswanger Glass Company.

Hanson closed his business and then filed suit against PPG on April 10, 1968, alleging that defendant treated Hanson's competitors more favorably than it treated Hanson, thus violating section 2 of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13 (1971). Plaintiff alleged that his "flourishing and profitable business" was destroyed and that he lost past and future profits estimated at $220,000. Plaintiff sought treble damages and reasonable attorneys' fees as provided by section 4 of the Clayton Act, 15 U.S.C. § 15 (1971). Defendant counterclaimed on Hanson's overdue note dated February 3, 1965, payable to PPG for $23,983.59 plus interest and attorneys' fees. The district court granted summary judgment on PPG's counterclaim for $29,111.45, together with $7,277.86 as attorneys' fees.

Plaintiff's claim was tried before a jury. After a trial that lasted several days, with testimony of numerous witnesses and receipt in evidence of over 10,000 exhibits, defendant moved for a directed verdict under Rule 50(a), Federal Rules of Civil Procedure. The district judge denied the motion, and the jury returned a verdict in favor of Hanson for $148,000. PPG filed a motion for judgment notwithstanding the verdict under Rule 50(b), which was also denied. The district judge trebled the verdict of $148,000 to a total of $444,000, and added an allowance of $80,000 for attorneys' fees. Only PPG appeals so the propriety of the summary judgment against Hanson on the counterclaim is not contested.

2. Another problem was a fire in 1963 which destroyed part of the building Hanson rented. He did not have adequate insurance to cover his loss.

Plaintiff grounds his action under the provisions of section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, which forbids "any person . . . to discriminate in price between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them." 15 U.S.C. § 13(a) (1971). There are three possible defenses available to defendant PPG under the circumstances of this case. First, section 2(a)[3] expressly permits justification for price differentials due to "differing methods" of manufacture. Second, section 2(a)[4] permits another cost justification[5] when "differing . . . quantities" are purchased. Third, section 2(b)[6] provides a defense if the seller lowered its price "in good faith to meet an equally low price of a competitor."

In assessing whether the defendant carried its burden of defending its price differentials, *see* Federal Trade Commission v. Morton Salt Co., 334 U.S. 37, 44–45, 68 S.Ct. 822, 827, 92 L.Ed. 1196 (1948), to such an extent as to warrant a directed verdict, we are guided by the standard of review enunciated in Boeing Company v. Shipman, 5 Cir., 1969, 411 F.2d 365, 374 (en banc):

On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case —but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n. o. v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts,

---

3. The defense is based on the following language in 15 U.S.C. § 13(a) (1971):

     . . . *Provided,* That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods . . . in which such commodities are to such purchasers sold or delivered . . . .

4. The defense is based on the following language in 15 U.S.C. § 13(a) (1971):

     . . . *Provided,* That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing . . . quantities in which such commodities are to such purchasers sold or delivered.

5. "Cost justification" is a term of art frequently employed by commentators to denote section 2(a) defenses for price differentials which reflect differences in the cost of supplying different purchasers. *See, e. g.,* P. Areeda, Antitrust Analysis 684 (1967); D. Baum, The Robinson-Patman Act 22 (1964); A. Stickells, Antitrust Laws 477–78 (1972).

6. The defense is based on the following language in 15 U.S.C. § 13(b) (1971):

     . . . *Provided, however,* That nothing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor.

and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses. We find that there is no conflict in substantial evidence and, accordingly, we are compelled to reverse.

Aside from a full transcript of the trial, together with all the exhibits, we have the benefit of a well-organized presentation of the facts submitted in the briefs of both parties which was not available to the jury or district court. Thus we have given unusually close and careful attention to the record herein.

During the trial plaintiff introduced numerous exhibits in an effort to show that the prices charged by PPG to Hanson were higher than those charged by PPG to competitors of Hanson. Plaintiff's counsel showed his exhibits to the jury on a projector, thereby saving the time of handing each exhibit from juror to juror. Plaintiff's counsel then interrupted the review of exhibits with a series of questions to Hanson about the history of Hanson's dealings with his customers. The defense responded with its own testimony, price lists, and invoices of sales by PPG's competitors. After studying the record we believe it was highly unlikely that the jury or district judge could have fully assimilated the material as presented. During oral argument of this case on appeal, we requested that counsel for plaintiff make a list in a supplemental brief of *each transaction* supporting his allegations of price discrimination. Counsel for defendant then agreed to review each transaction and justify any price differences between PPG's invoices to Hanson and to his competitors in a reply brief.

Plaintiff's counsel prepared a "Chart of Comparable Sales" [7] to show in PPG's sales to Hanson the invoice number, date, item, and percentage of discount, which was then compared to discounts PPG gave to Hanson's competitors. Defendant responded to each instance of alleged price discrimination by producing folders of invoices categorically arranged by type of item sold. In addition, defendant supplied summaries by date of the price lists used by PPG and its competitors, such as Safelite, Autoglass Company, and Carlite.

After reviewing this material we find that the three defenses justify all of the instances of price differentials except a few which are *de minimis*.[8]

We illustrate how each defense applies to certain transactions as follows: As to the first defense pertaining to price differentials due to "differing methods" of manufacture, the documentation shows that sales listed by Hanson in support of his contention of price differentials actually involved items where there was justification for the difference based on higher cost of manufacture. Hanson thus lists a purchase from PPG dated April 15, 1964, of ⅛-inch Factrolite at a price of 62 cents per foot and Geldmeier's purchase from PPG at 35 cents per foot. But reference to the invoices shows that Hanson purchased specially cut size whereas Geldmeier purchased a standard stock size. Both

---

7. This "Chart of Comparable Sales" was essentially the same as Exhibit A in plaintiff's original appellate brief. At oral argument, after counsel for plaintiff called Exhibit A the "critical exhibit as far as plaintiff is concerned," this Court asked, "Do you stand or fall on whether the proof in Exhibit A stands or falls?" Counsel answered, "I will come close to saying, yes sir." Then he went on to say that the exhibit represents the "bulwark" of purchases in years 1964 and 1965 by Hanson from PPG.

8. Several sales by PPG to Binswanger Glass Company of Shreveport, Louisiana, are in the *de minimis* category. Bins-

wanger was a competitor of PPG, so PPG had no interest in making sales in large quantities at low prices to Binswanger, thereby minimizing any potential harm to Hanson or to the public. The quantity of such sales was small, apparently only occurring as a courtesy which one distributor extended to the other when one had need of an item not in stock. These *de minimis* sales do not violate section 2(a), since the section applies only where "the effect of such discrimination may be *substantially* to lessen competition." (Emphasis added.) See Skinner v. United States Steel Corp., 5 Cir., 1956, 233 F.2d 762, 764.

sales by PPG to Hanson and to Geldmeier followed PPG's published price. The different price reflects the added cost of specially cutting the items and is therefore justified under section 2(a). *See* Sylvania Elec. Prod., Inc., 51 F.T.C. 282 (1954), *reprinted in* 2 S. Oppenheim & G. Weston, The Lawyers' Robinson-Patman Act Sourcebook 921 (1971). *See generally* P. Areeda, Antitrust Analysis 685 (1967); E. Kintner, An Antitrust Primer 68–70 (1964); F. Rowe, Price Discrimination Under the Robinson-Patman Act 281–82 (1962).

■ As to the second defense which related to cost justification when differing quantities are purchased, Hanson compared PPG sales without indicating that Hanson bought less on these occasions than his competitor purchased from PPG. Volume discounts are typical for this industry.[9] Any lower price given to Hanson's competitor followed a price list granting volume discounts. As an illustration, Hanson's chart compared his purchase of a ¼-inch thick mirror on June 18, 1965, with Magnolia's purchase on January 20, 1965, demonstrating that PPG charged Hanson $1.10 per square foot and Magnolia $1 per square foot. Yet the chart failed to compare the volume involved in each purchase. Hanson purchased one mirror of about 41 square feet whereas Magnolia purchased eleven mirrors totaling 429 square feet. PPG's published price list shows a charge of $1.10 per square foot for a purchase of less than 400 square feet, a charge of $1 per square foot for a purchase of more than 400 square feet, and a charge of 95¢ per square foot for a purchase of 850 square feet. What

PPG charged Hanson and Magnolia conforms exactly to the price list. Magnolia got a lower price by purchasing a sufficient quantity to be eligible for a 10¢ per square foot savings. We recognize the difficulty of justifying quantity discounts. *See* United States v. Borden Co., 370 U.S. 460, 82 S.Ct. 1309, 8 L.Ed. 2d 627 (1962); Automatic Canteen Co. v. Federal Trade Comm'n, 346 U.S. 61, 68, 73 S.Ct. 1017, 1021–1022, 97 L.Ed. 1454 (1953). *See generally* P. Areeda, Antitrust Analysis 686 (1967); F. Rowe, Price Discrimination, ch. 10 (1962); Lovett, A Crossroads for the Robinson-Patman Act, 45 Tul.L.Rev. 1, 11–14 (1970). But this case differs in principle from the leading case of Federal Trade Commission v. Morton Salt Co., 334 U.S. 37, 42, 68 S.Ct. 822, 826, 92 L.Ed. 1196 (1948), where the quantity discounts were "equally available to all, but functionally they are not." PPG's price schedules did not require a purchase of such large quantities as to make the discounts functionally unavailable to Hanson. The discounts were graduated with such small increments that they appear to reflect only the differences in the cost of manufacturing, selling, and delivering items in larger volume.

As to the third defense relating to price differentials to meet competition, in the instances where PPG gave some customers a price differing from the price available to Hanson, PPG met the price offered to the customers by competitors of PPG. Thus PPG followed its own published price list in sales of windshields to Hanson but followed Safelite's published price list in sales of windshields to Martex.[10]

---

9. The importance of this factor is reflected in our recent opinion in Hampton v. Graff Vending Co., 478 F.2d 527, 537.

10. Using the example of automobile glass earlier referred to, we note that PPG's published price list gave discounts of the following amounts depending on the quantity of windshields purchased:
52.60% discount for 1 part
55.00% discount for 2 parts

56.80% discount for 3 parts
58.00% discount for 4 to 11 parts
59.80% discount for 12 to 23 parts
61.00% discount for 24 or over parts
Safelite, however, offered the following published discounts on windshields, which were greater and resulted in lower prices:
60% discount for 1 to 2 parts
61% discount for 3 to 5 parts
62% discount for 6 to 23 parts
63% discount for 24 or more parts

The meeting of competition defense provided in section 2(b) has been interpreted to be an absolute defense, Standard Oil Co. v. Federal Trade Comm'n, 340 U.S. 231, 71 S.Ct. 240, 95 L.Ed. 239 (1951); Jones v. Borden Co., 5 Cir., 1970, 430 F.2d 568, 572, and applies despite the incidence of damage to nonfavored purchasers. Federal Trade Comm'n v. Sun Oil Co., 371 U.S. 505, 519–520, 83 S.Ct. 358, 367, 9 L.Ed.2d 466 (1963); see C. Austin, Price Discrimination 97 (1959). We believe that a "reasonable and prudent" man would conclude that PPG adopted Safelite's price list as a reasonable method of meeting the lower price of its competitor, thereby satisfying the test enunciated in Callaway Mills Co. v. Federal Trade Comm'n, 5 Cir., 1966, 362 F.2d 435, 442. See also Jones v. Borden Co., 5 Cir., 1970, 430 F.2d 568, 572; Surprise Brassiere Co. v. Federal Trade Comm'n, 5 Cir., 1969, 406 F.2d 711, 715.

Hanson's counsel argued to the jury, however, that PPG did not verify its competitors' offers until after the lawsuit was filed.[11] We note in the record, however, several letters between PPG's salesman and district manager discussing the need to meet competition from Safelite. There is also other evidence to confirm that PPG acted in good faith to meet competition. Safelite made its prices available to many retailers in the area, so its prices were not secret.[12] A representative of Hanson's competitor, Ray Lawson of Martex, testified that the lower prices they received from PPG came after a discussion of prices being offered by PPG's competitors.

Hanson contends that it was indicative of PPG's "predatory intent" that PPG called on Hanson's customers and offered them greater discounts than were given to Hanson. But these discounts conform to the competitive prices offered by PPG's competition. Furthermore, the customers Hanson mentioned were volume purchasers, such as automobile dealers, who reasonably might be expected to deal directly with a manufacturer. When Hanson resigned from PPG in 1946 to establish an independent business, he did not retain an exclusive right to deal with customers in the area of Eastern Texas. He had been the PPG salesman in the area prior to 1946, and, after he left, PPG replaced him with another salesman. Even though

To further illustrate what the proof showed, and applying the above discounts, we have examined a number of PPG sales of windshields listed in plaintiff's brief and have added a column indicating the volume purchased, as follows:

Hanson

| Invoice (PPG) | Date | Volume | Discount |
|---|---|---|---|
| 01659 | 4/13/64 | 1 | 52.60% |
| 01534 | 4/16/64 | 2 | 55.00% |
| 01579 | 4/16/64 | 1 | 52.60% |
| 02079 | 4/22/64 | 1 | 52.60% |
| 04010 | 5/28/64 | 1 | 55.00% |
| 04365 | 6/ 4/64 | 2 | 55.00% |
| 06135 | 7/ 6/64 | 1 | 52.60% |
| 07625 | 7/31/64 | 1 | 52.60% |

Martex

| Invoice (PPG) | Date | Volume | Discount |
|---|---|---|---|
| 04505 | 6/ 8/64 | 11 | 62.00% |
| 05856 | 6/30/64 | 6 | 62.00% |
| 07527 | 7/29/64 | 2 | 60.00% |

It is thus clear that PPG's charges to Hanson followed the PPG published price list (shown above), and its charges to Martex met Safelite's published price list (shown above). The only exception is an invoice to Hanson, number 04010, where PPG gave Hanson a greater discount than was warranted by the volume purchased.

11. In a case denying the defense due to inadequate efforts to verify the competitor's prices, the Supreme Court concluded that "the statute at least requires the seller, who knowingly discriminated in price, to show the existence of facts which would lead a reasonable and prudent person to believe that the granting of a lower price would in fact meet the equally low price of a competitor." Federal Trade Comm'n v. A. E. Staley Mfg. Co., 324 U.S. 746, 759–760, 65 S.Ct. 971, 977, 89 L.Ed. 567 (1945).

12. Hanson himself on October 1, 1964, ordered six windshields from Safelite, of which five were delivered and one backordered, at Safelite's discount of 62 per cent.

there may be some doubt whether the defense of meeting competition is available when used to gain new customers as opposed to retaining old ones, no such distinction is apparent in the statute, and accordingly we follow the reasoning of the decision by the Seventh Circuit in Sunshine Biscuits, Inc. v. F.T.C., 1952, 306 F.2d 48,[13] and find that PPG engaged in reasonable competitive tactics. *See generally* Hampton v. Graff Vending Co., 5 Cir., 1973, 478 F.2d 527, 537.

Our review of the case convinces us that there is no conflict in substantial evidence, and that a verdict should have been directed for defendant. PPG does not dispute plaintiff's evidence, but relies on the defenses provided for by the Clayton Act itself (as amended). The differences in prices charged by PPG are in each instance fully supported by one of these defenses and by evidence in which there is no substantial conflict.

Finally, the evidence does not support Hanson's argument that he went out of business due to PPG's pricing policies during the relevant period[14] from 1964 to 1968. Hanson's purchases from PPG during the four-year period never exceeded 26 per cent of his total purchases in any single calendar year and were as low as 1 per cent in one

year. These purchases are summarized as follows:

| Year | Hanson's Purchases From All Suppliers | Hanson's Purchases From PPG | Hanson's Purchases From PPG As Percentage of Hanson's Purchases From All Suppliers |
|---|---|---|---|
| 1968 | $ 6,777 | $ 442 | 6 % |
| 1967 | 5,227 | 39 | 1 % |
| 1966 | 7,626 | 192 | 2 % |
| 1965 | 18,795 | 3,493 | 18 % |
| 1964 (Apr.Dec.) | 17,589 | 4,573 | 26 % |

Nevertheless, competitive injury may be inferred when one set of customers buys at substantially lower prices than other customers. Federal Trade Comm'n v. Morton Salt Co., 334 U.S. 37, 47, 68 S. Ct. 822, 828–829, 92 L.Ed. 1196 (1948). In the present case, any inferred competitive injury is negated by the fact that Hanson had available comparable products from other suppliers at prices equivalent to the prices PPG gave to Hanson's competitors. *See* Admiral Corp., FTC Dkt., CCH Trade Reg. Rep. ¶ 17,230, p. 22,304 at p. 22,309 (1965), *reprinted in* S. Oppenheim & G. Weston, The Lawyer's Robinson-Patman Act Sourcebook 256, 262 (1971). *See also* Borden Co. v F.T.C., 5 Cir., 1967, 381 F.2d 175, 180.

A review of Hanson's profits for the period 1948 through 1968[15] belies the

13. *Accord,* National Dairy Prod. Corp. v. Federal Trade Comm'n, 7 Cir., 1968, 395 F.2d 517, 524 n. 3, *contra,* Standard Motor Prod., Inc., v. Federal Trade Comm'n, 2 Cir., 1959, 265 F.2d 674, 677. *See generally* 4 J. von Kalinowski, Antitrust Laws and Trade Regulation, p. 32–73 (1970): "The better rule is that of the Seventh Circuit."

14. According to 15 U.S.C. § 15(b) (1971), "Any action to enforce any cause of action . . . of this title shall be forever barred unless commenced within four years after the cause of action accrued." *See generally* A. Stickells, Antitrust Laws 644 (1972).

15. The 1948–1968 profits are as follows:

| Year | Hanson's Profit |
|---|---|
| 1968 | (undetermined loss) |
| 1967 | (undetermined loss) |
| 1966 | ($4,930) |
| 1965 | ($ 132) |
| 1964 | $ 204 |
| 1963 | ($13,759) |
| 1962 | ($2,128) |
| 1961 | ($15,452) |
| 1960 | ($6,437) |
| 1959 | N. A. |
| 1958 | $ 613 |
| 1957 | ($8,080) |
| 1956 | ($2,874) |
| 1955 | $5,437 |
| 1954 | $6,299 |
| 1953 | $13,259 |
| 1952 | $11,246 |
| 1951 | $6,568 |
| 1950 | $25,095 |
| 1949 | $21,047 |
| 1948 | $14,185 |

conclusion that PPG drove him out of business by its pricing policies during the statutory period from 1964 to 1968. During most of the last thirteen years he consistently operated at a loss. It had been eight years prior to the start of the statutory period since Hanson made a substantial profit. His business, therefore, was not, as he contends, "flourishing and profitable" at the time PPG began giving his nearest competitor, Martex, the greater discounts.

The actual causes of Hanson's failure appear to be the new competition after 1952, the fire that partially destroyed the building in 1963 when he had inadequate insurance to cover his loss, and Safelite's refusal to deal with him after 1965 when he did not pay his debt. None of these causes can be attributed to the actions of PPG.

Reversed.