**CENTRAL ICE CREAM COMPANY, an Illinois corporation, Plaintiff,**

v.

**GOLDEN ROD ICE CREAM COMPANY, an Illinois corporation, Defendant.**

No. 56C1010.

United States District Court
N. D. Illinois.
June 16, 1960.

**313**

William C. Wines, Chicago, Ill., for plaintiff.

Philip A. Rose, Chicago, Ill., for defendant.

CAMPBELL, Chief Judge.

Plaintiff, Central Ice Cream Company, an Illinois corporation, brought this action for injunctive relief and damages against Golden Rod Ice Cream Company, an Illinois corporation, alleging conduct by defendant in violation of the Sherman Anti-Trust Act, Title 15 U.S.C.A. § 1, the Clayton Act, Title 15 U.S.C.A. § 13, the Robinson-Patman Act, Title 15 U.S.C.A. §§ 13a and 13b, the Civil Rights Act, Title 42 U.S.C.A. § 1985(3) and the National School Lunch Act, Title 42 U.S. C.A. § 1753. Plaintiff has since expressly disclaimed any reliance upon all except one of the above statutes and the case now comes on for disposition upon a Stipulation of Facts and the exhibits and briefs of the parties, plaintiff resting its claim for relief exclusively upon Section 2 of the Clayton Act as amended by Section 1 of the Robinson-Patman Act, Title 15 U.S.C.A. § 13(a–f).

Plaintiff maintains an ice cream manufacturing plant and garage in Chicago, Illinois, a distribution plant and garage in Joliet, Illinois, and has a fleet of approximately thirty trucks and other items of equipment all of which are used in its business of manufacturing and selling ice cream in Indiana and Illinois. During the calendar year 1955 plaintiff sold 99.975% of its ice cream to retailers in Illinois and .025% to retailers in Indiana.

During the year 1955, with which we are concerned here, milk received in the Chicago milk marketing area from Illinois and Wisconsin totaled 4,403,121,129 pounds. The said milk averaged 3.60 pounds of butterfat per hundred pounds of milk and thus contained 158,512,385 pounds of butterfat. The total pounds of butterfat used by ice cream manufacturers in 1955 was 9,594,483 pounds or 6.052% of the total butterfat received in the Chicago milk marketing area in 1955. Plaintiff used 0.322% of the butterfat reaching the Chicago milk marketing area in 1955 and used 5.318% of the total butterfat used in the production of ice cream by all ice cream handlers in the Chicago marketing area in 1955.

Defendant maintains an ice cream manufacturing plant in Chicago, Illinois, and sells and delivers ice cream, sherberts and other frozen desserts solely within the State of Illinois. In 1955, defendant used 0.452% of the butterfat reaching the Chicago milk marketing area from Illinois and Wisconsin and

7.468% of the total butterfat used in the production of ice cream by all ice cream handlers in the Chicago marketing area.

Defendant, among other customers, sells and delivers ice cream to Fred Harvey, a New Jersey corporation, all sales and deliveries taking place in Chicago. These sales and deliveries are made at the Union Station and Polk Street Station for consumption and sale only in the restaurants or lunch rooms operated by Fred Harvey in these railroad depots. Sales and deliveries of ice cream by defendant have also been made to two other Fred Harvey restaurants, located at 919 North Michigan Avenue, Chicago, and 308 South Michigan Avenue, Chicago, for sale and consumption in said restaurants. A small portion of total sales by defendant to Fred Harvey is delivered to the Fred Harvey Commissary, 2014 South Wentworth Avenue, Chicago. This ice cream is subsequently resold by Fred Harvey to the Atchison, Topeka & Santa Fe Railroad Company and used in the dining cars of that railroad company traveling between Chicago and the Pacific Coast. Defendant has had no dealings, contractual or otherwise, with the railroad company with respect to the sale of ice cream and has not exercised any control or domination over the use or disposition of such ice cream by Fred Harvey subsequent to its sale and delivery to Fred Harvey in Chicago. None of the ice cream sold to Fred Harvey by the defendant is of the same or like grade and quality sold by defendant to any other customer, but is made to Fred Harvey's special formula and is richer in butterfat. Defendant's deliveries to the Fred Harvey Commissary in 1955 comprised 0.095% of the total butterfat allocated to ice cream manufacturers and 0.005% of total butterfat reaching the Chicago milk marketing area.

For many years prior to November 5, 1955, defendant had sold and supplied ice cream to public authorities and agencies in Illinois, one of which was the Board of Education of the City of Chicago, which purchased the products for re-sale to school children. In 1955 plaintiff intended to submit a bid to the Board of Education of the City of Chicago for the sale of ice cream for its school lunch program. On November 3, 1955, the following conversation took place between Philip Sang, then defendant's Vice-President, and Thomas N. Cummings, plaintiff's Vice-President in 1955:

"Tom, who was leaving his car there was—after some fifteen minutes of conversation, Tom just about as he was to take leave of me said, 'Phil, how long have you served the schools?'

"I said, 'Some twenty odd years, Tom. Why, are you thinking about bidding?'

"He said, 'I don't know.'

"I said, 'Well, Tom, you know if we lose that business we are certainly going to have to make an effort to fill the gap.'

"And with that, Tom took leave and I drove on back to the plant."

Subsequently, plaintiff did submit its bid to the Chicago Board of Education and the bid was accepted. In the six or seven weeks following November 4, 1955, the defendant's salesmen called on plaintiff's customers in the Chicago area within the State of Illinois, and not elsewhere, soliciting their ice cream business, and in many instances made loans of money to said customers by way of advanced discounts in order to procure their business. Such loans were represented by customers' notes payable to defendant, and in most instances were to be amortized or repaid out of a special discount, usually at the rate of ten cents per gallon, to be allowed such customers upon their purchases of ice cream from the defendant. Such loans were not uniform in amount, but were based upon the defendant company's estimate of the potential volume of business to be procured from each of said customers. Defendant did not at that time make or offer to make similar advances of money to all of its then customers in the Chicago area, but "such advances or loans were made to meet competition from the plain-

tiff and other purveyors of ice cream in the Chicago area".

A total of 101 customers of plaintiff, all located within the Chicago area within the State of Illinois, subsequently became customers of defendant. Their names, the advances made by defendant and the security for these advances are recited in Exhibit 1 to the Stipulation. The total of such advances is $13,730.00, plus, in one instance, the loan of two air conditioners to a customer of plaintiff.

In 1955 and presently, approximately twenty-five ice cream manufacturing firms were located in Chicago. Several of these manufacturers are huge companies with plants in many different areas, as for example, Bordens, National Dairy Products and Swift & Company.

Competition for ice cream business in Chicago has been for many years and is now very intense. Retailers with any considerable volume or potential volume of retail sales bargain extensively with manufacturers for financial help in the way of loans or special price concessions. Manufacturers have and do make loans or give special prices or special discounts to retailers to procure or hold their business. All of the larger ice cream manufacturers periodically publish price lists and such published prices are fairly comparable. In 1955 plaintiff had in effect a price list substantially comparable to defendant's published price list. Plaintiff's price list allowed discounts on a quantity basis up to 12¢ per gallon. Defendant's list allowed comparable quantity discounts to a maximum of 8¢ per gallon. Ice cream packed in containers of one-half gallon capacity or less is considered "packaged" goods, as distinguished from "bulk". In 1955, from January until June, plaintiff allowed one food mart operator a discount of 30¢ per gallon from its list, when packed in pint packages, and 32¢ per gallon discount when packed in one-half gallon packages. In addition, plaintiff made loans to such operator in the amount of $25,000 each with respect to two stores, and $15,000 with respect to another store operated by said operator. Plaintiff did not make comparable loans and discounts to all of its customers. In addition, in these cases, it assisted in promotional sales from time to time, under which these food marts were able to buy for limited periods of three to five days ice cream at $1.04 per gallon, as compared with the list price of $1.78 per gallon. With another operator of food marts, plaintiff advanced loans at the rate of $25,000 each for two stores, amortizable over a 24-month period and bearing interest at the rate of one per cent per annum.

Defendant over the years has made many loans to its own customers, retail dealers in ice cream in Chicago, many of which were in the way of advance discounts repayable at 10¢ per gallon on all purchases by such retailers. Defendant has made such loans in order to meet and to attempt to meet competition in the sale of ice cream in Chicago.

It is a uniform practice in the industry in the Chicago area for manufacturers of ice cream to furnish retailers with mechanically refrigerated cabinets for the storage of ice cream in their retail stores. When a retailer changes from one manufacturer and becomes a customer of another, the manufacturer taking over the service removes the original vendor's cabinets and equipment and returns the same to the owner. It has been a general practice in the industry to allow retailers who purchase their own storage cabinets a discount of 10¢ a gallon off the published list prices in consideration of that fact. Both the plaintiff and the defendant have, with other competitors, followed said practice and have felt compelled to do so to meet competition in the area.

During 1955 plaintiff's sales manager had authority to quote any price on bulk ice cream—as distinguished from packaged ice cream—necessary to procure the business. Plaintiff sold bulk ice cream in the summer season of 1955 to Riverview Park at a price of $1.00 per gallon. It sold Northwestern University for a few weeks in 1955 at $1.20 per gallon.

On July 22, 1957, D.C., 153 F.Supp. 684, 686, I dismissed this complaint for failure to state a claim upon which relief may be granted under any of the several statutes set forth in the complaint as originally relied upon. As I then pointed out:

"The complaint alleges that plaintiff is an ice cream manufacturer in Illinois; that it 'imports a very substantial part of its milk, cream and other ingredients from Wisconsin and other states in interstate commerce, transforms them into ice cream in Illinois and sells this ice cream very extensively both in Illinois and in other states'; that defendant is engaged in manufacture of ice cream also and obtains the raw materials from other states but that 'so far as the plaintiff is informed the defendant makes no sales or deliveries of its ice cream outside Illinois'. The gravamen of the complaint is that sometime in November, 1955, plaintiff and defendant submitted rival bids to the Board of Education of the City of Chicago, for the supply of ice cream for use in the Board's school lunch program, which is subsidized by the Federal Government under the National School Lunch Act; that defendant warned plaintiff that if it should persist in its bid to secure a contract with the Board, defendant would make a concentrated effort to deprive plaintiff of its customers. The complaint further alleges that the contract was awarded to plaintiff and that thereupon defendant launched a campaign to solicit away most of plaintiff's customers 'in the Chicago area', offering loans, air conditioning units, deep freeze units and other items of personal property on condition that plaintiff's customers desert plaintiff and patronize defendant."

The Court of Appeals in reversing and remanding with directions on April 23, 1958, 7 Cir., 257 F.2d 417, 418, made the following statement:

"Central Ice Cream Company, plaintiff, from whose complaint we report some admitted facts, and Golden Rod Ice Cream Company, defendant, are each respectively engaged in manufacturing ice cream from milk, cream and other ingredients in Illinois. After bringing in some essential ingredients from Wisconsin and other states, plaintiff sells its ice cream in Illinois and other states using interstate trucking for delivery. On the other hand defendant, as well, imports ingredients, for its product, in interstate commerce, and plaintiff alleges:

"'So far as the plaintiff is informed the defendant makes no sale or deliveries of its ice cream outside of Illinois. But the defendant sells very substantial quantities of its ice cream to the Harvey restaurant chain, whose exact corporate name is unknown to the plaintiff but is well known to the defendant. The defendant makes its deliveries of such ice cream to the Harvey restaurant chain at all or most of the railroad depots in Chicago. The Harvey chain, regularly and continually places a large portion of the ice cream that is thus delivered in the depots by the defendant on dining cars of passenger trains traveling in interstate commerce, the Harvey chain having dining car concessions with respect to many such trains. Thus the defendant is a conduit for the regular and continuous flow of such ice cream from the defendant's manufacturing plants in Illinois, where the ice cream is manufactured largely from ingredients imported into Illinois in interstate commerce, to the dining cars of passenger trains traveling in interstate commerce.'

"There are allegations about defendant's discriminatory and unlawful methods of competition which, conclusions of the pleader aside, manifest enough to warrant an assumption on our part they existed.

What impact, if any, on interstate commerce there was is now a matter of proof, and Moore v. Mead's Fine Bread Co., 1954, 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145, warrants letting this complaint survive defendant's motion."

Section 2 of the Clayton Act, as amended by Section 1 of the Robinson-Patman Act, Title 15 U.S.C.A. § 13(a–f) provides as follows:

"(a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: Provided, That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered: Provided, however, That the Federal Trade Commission may, after due investigation and hearing to all interested parties, fix and establish quantity limits, and revise the same as it finds necessary, as to particular commodities or classes of commodities, where it finds that available purchasers in greater quantities are so few as to render differentials on account thereof unjustly discriminatory or promotive of monopoly in any line of commerce; and the foregoing shall then not be construed to permit differentials based on differences in quantities greater than those so fixed and established: And provided further, That nothing herein contained shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade: And provided further, That nothing herein contained shall prevent price changes from time to time where in response to changing conditions affecting the market for or the marketability of the goods concerned, such as but not limited to actual or imminent deterioration of perishable goods, obsolescence of seasonal goods, distress sales under court process, or sales in good faith in discontinuance of business in the goods concerned.

"(b) Upon proof being made, at any hearing on a complaint under this section, that there has been discrimination in price or services or facilities furnished, the burden of rebutting the prima-facie case thus made by showing justification shall be upon the person charged with a violation of this section, and unless justification shall be affirmatively shown, the Commission is authorized to issue an order terminating the discrimination: Provided, however, That nothing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor.

"(c) It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, any-

thing of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid.

"(d)  It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities.

"(e)  It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale, with or without processing, by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms.

"(f)  It shall be unlawful for any person engaged in commerce, in the course of such commerce, knowingly to induce or receive a discrim-

ination in price which is prohibited by this section."

Shortly after the passage of the Robinson-Patman Act, Zorn and Feldman, in "Business under the New Price Laws", after carefully considering its economic background and legislative history, analyzed its provisions as follows at page 62:

"1.  There must be a discrimination between two or more customers of a given seller.

"2.  The difference in price must be made in connection with commodities of 'like grade and quality.'

"3.  One of the purchases involved must be in interstate commerce.

"4.  The commodities involved must have been sold for use, consumption, or resale within the United States or its territories or insular possessions, and not for purposes of export.  (Under the definition in the Clayton Act, insular possessions do not include the Philippine Islands.)

"5.  The transaction must involve the sale of commodities and not the sale of services.

"6.  Even if each of the above factors is present, a discrimination is not unlawful unless, in addition to the foregoing, its effect may:

"(a)  Substantially lessen competition in any line of commerce; or

"(b)  Tend to create a monopoly in any line of commerce;  or

"(c)  Injure, destroy, or prevent competition:

"(1) With the person who grants the discrimination.

"(2) With or among any of his customers.

"(3) With the person who knowingly receives the discrimination.

"(4) With or among any of his customers.

"(5) With or among the customers of either of them.

"The injury or suppression of competition must be such as sufficiently to affect, burden, or constitute an impediment to interstate commerce."

Defendant, while not pursuing the above exhaustive analysis of Section 1 of the Robinson-Patman Act, points out that by the express terms of the section, the plaintiff, in order to recover, has the burden of showing:

(1) That defendant was engaged in commerce;

(2) Discrimination by the defendant "in the course of such commerce * * * in price between different purchasers of commodities of like grade and quality * * *";

(3) That "the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce or to endanger, destroy or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination or with customers of either of them."

Defendant thus argues that:

(1) Defendant was not engaged in commerce;

(2) Defendant did not "in the course of such commerce, either directly or indirectly, discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce;

(3) The proof shows that there was not any impact on commerce.

As to defendant's first argument, I find that defendant was not "engaged in commerce".

Though it is conceded that many of the ingredients, such as flavoring extracts, nuts, sugar and cocoa, which are used in the manufacture of ice cream come from outside the State, it is clear that when these ingredients reach defendant's Chicago plant, they have come to rest and commerce has ceased. Ewing-Von Allmen Dairy Co. v. C & C Ice Cream Co., Inc., 6 Cir., 109 F.2d 898. The fact that defendant used 0.452% of the butterfat reaching the Chicago milk marketing area in 1955 from intrastate and interstate sources does not, in my opinion, establish defendant as a "person engaged in commerce".

I further find that defendant is not "a conduit for the regular and continuous flow of * * * ice cream from the defendant's manufacturing plants in Illinois, where the ice cream is manufactured largely from ingredients imported into Illinois in interstate commerce, to the dining cars of passenger trains traveling in interstate commerce".

The sale of ice cream, comprising 0.005% of the total butterfat reaching the Chicago milk marketing area in 1955 from intrastate and interstate sources, by defendant to the Fred Harvey Commissary, 2014 S. Wentworth Avenue, Chicago, does not in any way establish defendant as a "conduit" into interstate commerce since defendant exercised no control or dominion over the use or disposition of such ice cream by Fred Harvey after its sale and delivery to that company and therefore cannot be legally associated with Fred Harvey's subsequent sale of the ice cream to the Atchison, Topeka and Santa Fe Railroad.

As to defendant's second argument, it is obvious from what I have said above, that defendant could not "in the course of such commerce" discriminate between different purchasers. However, assuming that defendant is in the "course of commerce" because of its sales and deliveries to the Fred Harvey Commissary, then there could be no discrimination between different purchasers of commodities of "like grade and quality", since the ice cream sold by defendant to Fred Harvey was made to Harvey's special formula and is different in grade and quality from the ice cream sold by defendant to all its other customers.

As to defendant's third argument, I find that there was not any impact on commerce. In the Stipulation of Facts, Exhibits 3, 3A and 3B graphically portray, first, the amount of butterfat re-

ceived in the Chicago milk marketing area for the calendar year 1955; second, the total amount of such butterfat utilized by all the ice cream manufacturers in the marketing area; third, the portion of such butterfat utilized in such period by either of the parties, and fourth, the quantity and proportion of such butterfat involved in the defendant's sales to Harvey and the portion involved in defendant's deliveries to the Harvey Commissary, this latter being the amount that Harvey in turn resold to the railroad. From Exhibit 3, it thus appears that of the total butterfat brought into the Chicago milk marketing area during 1955, the defendant used less than one-half of one per cent, the precise figure being 0.452%; while the plaintiff used less than one-third of one per cent, the precise figure being 0.322%. There is no showing as to how much of the total butterfat received in the market during that year came in from the State of Wisconsin, but from paragraph 3 of the Stipulation, it appears that this butterfat came from milk originating in the States of Wisconsin and Illinois, so it is apparent that the percentages of use by the parties shown in Exhibit 3 includes butterfat originating within Illinois.

It appears from Exhibit 3B that of the more than 158,000,000 pounds of butterfat brought into the market, slightly over 9,000 pounds were involved in defendant's deliveries to the Fred Harvey Commissary, representing less than $\frac{1}{10}$th of 1% of butterfat used in ice cream in the Chicago market and slightly over $\frac{1}{2}$ of $\frac{1}{100}$th of 1% of the total butterfat coming into the Chicago market.

In addition, defendant in 1955 did not sell or deliver any ice cream outside the State of Illinois while plaintiff sold and delivered 99.975% of its ice cream in Illinois and only .025% in Indiana.

Furthermore, I find no proof of discrimination here. It appears affirmatively from the Stipulation that the prac-

tices complained of have been consistently carried on by manufacturers of ice cream in the Chicago area. Because of "intense competition", manufacturers, *including plaintiff*, have regularly made loans and special price concessions to retailers in order to procure or hold their business and to meet competition. Balian Ice Cream Co. v. Arden Farms Co., 9 Cir., 231 F.2d 356, 368. Even assuming discrimination and interstate commerce, it is clear from the Stipulation, as I have previously found, that the effect of such discrimination is not *"substantially* to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefits of such discrimination, or with customers of either of them" (Emphasis supplied).

Plaintiff has argued extensively from Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed. 2d 741 and Moore v. Mead's Fine Bread Co., 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145.

Insofar, as Klor is concerned, I think it patently obvious from a clear analysis of that case, that its teachings are not applicable here.

Although, as the Court of Appeals has indicated, the instant complaint contains allegations which, if proved, could bring this cause within the purview of Moore, I now find that the evidence before me does not bring this cause within the required proofs of that case, since defendant is not an "interstate industry" as the defendant in Moore and there has been no discrimination here with an impact on interstate commerce.

For the reasons stated, the cause is dismissed at plaintiff's costs. Judgment for defendant. The foregoing shall, in accordance with the provisions of Rule 52(a) of the Rules of Civil Procedure, 28 U.S.C., stand as the Court's Findings of Fact and Conclusions of Law herein.