Joseph GLOWACKI, d/b/a Distributor's Dairy Products, et al., Plaintiffs,

v.

BORDEN, INC., a corporation, Defendant.

No. 72 C 2995.

United States District Court, N. D. Illinois, E. D.

Sept. 23, 1976.

Jason E. Bellows and Ronald N. Heftman, Chicago, Ill., for plaintiffs.

H. Blair White, Stuart S. Ball and Tom W. Stonecipher of Sidley & Austin, Chicago, Ill., for defendant.

## MEMORANDUM OPINION

GRADY, District Judge.

This case involves a claim for damages sustained as a result of alleged price dis-

crimination by defendant, Borden, Inc., in the marketing of milk products in violation of Sections 2(a), (d) and (e) of the Robinson-Patman Act, 15 U.S.C. § 13(a), (d), and (e). Plaintiffs are former distributors of defendant, a manufacturer of dairy products. At issue in this case are defendant's practices in marketing the following products: Homogenized Vitamin D Milk ("H.V.D. Milk"), Gail Borden Milk (a rich milk containing a high butterfat content and fortified with certain minerals and vitamins), 2% milk (containing two per cent butterfat), Low Fat Milk (containing one per cent butterfat), Fortified Skim Milk, Buttermilk, Chocolate Low Fat Milk, Chocolate Milk, and Half and Half (containing 10½ per cent butterfat). Before the court are six motions for summary judgment. Because these motions actually comprise one motion for summary judgment on six different grounds, we will decide them together. Each of these grounds will be discussed in turn.

## INTERSTATE COMMERCE

Defendant first contends that the interstate-commerce element of the statute has not been met. Under the Robinson-Patman Act, the violation must be shown to have been committed in the course of interstate commerce. Under the Supreme Court's decision in *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974), one of the transactions which, when compared, generates a discrimination, must occur in interstate commerce. Borden argues that, since its sales all took place within Illinois, this element is not met. However, much of the raw milk which was processed into the products at issue originated in Wisconsin. Plaintiffs' contention is that the local sales of the products within Illinois were part of the stream of commerce that began in Wisconsin and was completed in Illinois. Defendant, on the other hand, contends that the processing of the raw milk at its Woodstock, Illinois, plant into the finished products broke that stream of commerce and thus that the subsequent sales of the products were wholly intrastate. We agree

with plaintiffs that the processing was not sufficient to break the flow of commerce, and we will therefore deny the motion in this respect.

According to an affidavit and deposition of Craig Sandusky, former general superintendent of defendant's Woodstock plant, raw milk was treated by Borden in a number of ways while being processed into the products at issue. First, the milk was tested and then "clarified" by removing dead milk cells and impurities. Next, some of the milk was "separated" into cream and skim milk. The remainder of the raw milk was "standardized" to the proper butterfat content by the addition of separated skim milk. This standardized milk was the basis for H.V.D. Milk, the largest seller among the products at issue. The milk products with low and high fat contents were produced by the mixture of separated cream and skim milk. At this point, various vitamins and minerals were added to the milk, the types and amounts varying according to the kind of milk being produced. The next step was "pasteurization," which involved killing the enzymes in the milk. Except for buttermilk and chocolate milk, all the milk was then "homogenized," by fracturing the butterfat cells into smaller portions so that they would not rise to the top of the bottle. Buttermilk was produced from pasteurized skim milk by innoculating it with a bacteria. Chocolate milk was produced from pasteurized milk by the addition of sugar, chocolate and an emulsifier. The final step was bottling the milk. Defendant argues that as a result of this processing, the finished milk products were different from raw milk and that therefore the stream of commerce must have been broken. It relies on *Central Ice Cream Co. v. Golden Rod Ice Cream Co.*, 287 F.2d 265 (7th Cir. 1961), *cert. denied*, 368 U.S. 829, 82 S.Ct. 50, 7 L.Ed.2d 32 (1961), *aff'g* 184 F.Supp. 312 (N.D.Ill.1960), which held that the processing of milk into ice cream broke the stream of commerce.

However, not all changes that may be undergone by a commodity will break the flow of commerce. In a case similar to the

one at bar, the Seventh Circuit held that processing of milk resulted in only minimal changes and that the milk retained its "essential identity" at the end of the process. *Dean Milk Co. v. F. T. C.*, 395 F.2d 696 (7th Cir. 1968). The court accordingly held that the stream of commerce had not been broken when raw milk, which had crossed state lines, was processed. The court relied heavily on *Foremost Dairies v. F. T. C.*, 348 F.2d 674 (5th Cir.), *cert. denied*, 382 U.S. 959, 86 S.Ct. 435, 15 L.Ed.2d 362 (1965), in which the court held that standardization, homogenization and bottling of milk resulted in "negligible" changes in the milk and did not break the flow of commerce.

We cannot distinguish the present case from those two. Defendant argues that the changes undergone by the raw milk in the present case must be much greater than those in *Dean Milk* and *Foremost Dairies*. It seizes on the characterization by the courts of the processing involved in those two cases as "minimal" and "negligible" to indicate that virtually no changes were made to the milk. We find several problems with this argument. Defendant has misinterpreted those two decisions. The courts clearly did not mean that the milk had not been processed, but rather that the processing that had been done was insufficient to break the chain of commerce. That the milk had been processed was clear. Although in *Foremost Dairies*, the F. T. C.'s order encompassed only fluid milk, and not milk by-products like buttermilk (*In the Matter of Foremost Dairies, Inc.*, 62 F.T.C. 1344 [1963]), the milk had been tested, standardized, pasteurized, and in most cases homogenized. 348 F.2d at 676. In *Dean Milk*, although the court did not set forth the processes that the milk had undergone, an examination of the F. T. C.'s decision, 68 F.T.C. 710 (1965), reveals that the processing was nearly as extensive as that in the present case, including, at a minimum, standardization, pasteurization, homogenization, and bottling. Moreover, the range of products was as great as that here. The Commission complaint included buttermilk, half and half, whipping cream and other products, as well as fluid milk. The Com-

mission's final opinion included in its discussion not just fluid milk, but also buttermilk, half and half, and flavored milk. Since the Commission's record and opinion were before the court, we must assume that the court was aware of this processing and considered it insufficient to break the flow of commerce.

Our decision finds support in an unpublished opinion by Judge Will of this court, *Frank J. Scardino Milk Distributors, Inc. v. Sidney Wanzer & Sons, Inc.*, No. 71 C 693 (N.D.Ill., filed August 9, 1972), in which he held that the processing of raw milk into fluid milk and milk by-products like multi-vitamin milk, buttermilk, chocolate milk, and cottage cheese did not break the steam of commerce. Defendant argues that Judge Will was in error because he held that Congress had used its full "affecting-commerce" jurisdiction over interstate commerce in enacting the Act, rather than the limited "in-commerce" jurisdiction. We do not so interpret Judge Will's opinion. Throughout the opinion, Judge Will discussed the defendant's operations in terms of the stream-of-commerce standard applicable to Robinson-Patman cases. Furthermore, although that case was decided before *Copp Paving*, the Seventh Circuit had previously held in *Borden Co. v. F. T. C.*, 339 F.2d 953 (7th Cir. 1964), that the Robinson-Patman Act is violated only where one of the transactions occurs in interstate commerce. Judge Will cited and relied on that case. Defendant, however, takes exception to the following language towards the end of the opinion:

Relative insignificant differences in processing should not determine the scope of the Act. The whole trend in antitrust and commerce cases has been to be more inclusive jurisdictionally rather than less. Finally, this argument ignores recent Supreme Court cases as to the purview of the commerce clause. Sales of products which contain some small percentage of interstate material have been found sufficient to confer federal jurisdiction. *See, e. g. Katzenbach v. McClung*, 379 U.S. 294 [85 S.Ct. 377, 13 L.Ed.2d 290] (1964); *Daniel v. Paul*, 395 U.S. 298 [89

S.Ct. 1697, 23 L.Ed.2d 318] (1969). If Ollie's Barbeque's sales were in interstate commerce, Wanzer's surely are.

*Id.* at 10–11. Although this passage is possibly susceptible to defendant's interpretation, nevertheless, in view of the opinion's previously correct application of the law, we interpret it differently. The citation of the *McClung* case, which involved the constitutionality of an act of Congress under the commerce clause, causes us to believe that Judge Will was holding that, as applied to the defendant's activities, the Robinson-Patman Act was within Congress' authority to enact. As so interpreted, the opinion is not erroneous.

Finally, defendant argues that its milk was treated to a greater extent than the milk in *Dean Milk* and *Foremost Dairies*. Specifically, the opinions in those cases do not reveal whether the milk was clarified or whether vitamins and minerals were added. Parenthetically, we note that one of the products involved in the *Wanzer* case was vitamin-fortified milk. However, for present purposes, we will assume that none of the milk in *Dean Milk* and *Foremost Dairies* was either clarified or vitamin- or mineral-enriched. Nevertheless, we do not think that the changes to raw milk by those two processes are any more significant than those, like flavoring, involved in *Dean Milk*. They are, however, much less significant than the conversion of milk into ice cream involved in *Golden Rod*. In *Dean Milk*, the Seventh Circuit held that the stream of commerce is not broken if the processing of the commodity does not change its essential identity. While the conversion of milk into ice cream certainly changes its essential identity, that cannot be said of the clarification or enrichment of milk. Clarified and vitamin- and mineral-enriched milk is still identifiable as milk.

Accordingly, the defendant's motion for summary judgment on the commerce issue is denied.

## EXTENSIONS OF CREDIT

One of the plaintiffs' allegations is that defendant violated §§ 2(a), (d), and (e) of the Act by extending credit to A. L. Smith Food Distributors, Inc. ("Smith") on terms not made available to plaintiffs. Specifically, plaintiffs allege that defendant loaned money to Smith, guaranteed Smith's bank loans, and granted Smith longer periods of time than were given plaintiffs within which to pay for products purchased from defendant. Furthermore, plaintiff alleges that defendant did not charge Smith any interest on the amount owed to defendant for its purchases. For purposes of this motion, defendant admits these allegations, but adds that it did not charge interest to any of its customers, including plaintiffs, when it made sales on credit. This last contention is not disputed by plaintiffs. The discrimination in making sales on credit therefore consisted of granting to Smith a longer period in which to pay than was granted to plaintiffs.

The basis of defendant's motion as it relates to these allegations is that differing credit terms cannot constitute price discrimination under the Act. We will grant the motion as it relates to the allegations of discrimination in making and guaranteeing loans and as it relates to the allegations that the extensions of credit violated §§ 2(d) and (e). However, we will leave the question of whether the differential lines of credit violated § 2(a) for resolution at trial.

■ Section 2(a) of the Act prohibits a seller from discriminating in price between different purchasers of commodities of like grade and quality. Defendant's argument is that the differences in credit terms accorded to Smith and plaintiffs did not affect the price at which the goods were sold since the prices which, under the Act, must be compared to determine whether a discrimination has occurred are the actual invoice prices of the product.

In *Corn Products Refining Co. v. F. T. C.,* 324 U.S. 726, 740, 65 S.Ct. 961, 968, 89 L.Ed. 1320 (1945), the Supreme Court held that sales made at identical prices but with differences in other terms violate the Act if the different terms "operated to permit the favored customers to purchase at a lower

price than other customers, so that their only practical effect was to establish discriminations in price." After analyzing the legislative history, the Court concluded that Congress intended to prohibit differences in terms of sale where they amount to indirect discriminations in price. In the present case, whether the differential credit lines affected the prices paid by the buyers is a factual question that should be resolved at trial.

Borden asserts that differences in credit terms cannot violate § 2(a) because credit is subject to external factors like changing market conditions and the buyer's financial strength and therefore falls within the "changing conditions" defense set forth in the final clause of § 2(a). In support of this assertion, plaintiff relies on *Craig v. Sun Oil Co.*, 515 F.2d 221 (10th Cir. 1975), and *Lang's Bowlarama, Inc. v. AMF Inc.*, 377 F.Supp. 405 (D.R.I.1974). Neither of these cases, however, supports defendant's contention for the simple reason that defendant has presented us with no facts tending to show that the differences in credit terms were a result of market conditions or financial ability of the purchasers.

In *Craig,* the court affirmed summary judgment for a defendant accused of discriminating in credit terms. The court held:

> It is obvious that differences in the borrower's financial strength, business experience, and many other factors bring about differences in the terms of credit, security required, guarantees and other devices used by creditors under these circumstances. . . . We do not say that there could not be a discrimination in credit of such magnitude or nature as to constitute a violation, but no such extreme situation was alleged here by any means."

515 F.2d at 224 [citations omitted]. The court did not indicate whether the defendant had made an affirmative showing that the different terms resulted from these fac-

tors, nor did it state what kind of differences in terms would violate the Act. In our view, however, where one of the credit terms is that no interest is to be paid and where the defendant makes no factual showing that the discrimination results from legitimate factors, the "changing conditions" defense will not save the defendant from liability.

In *Lang's Bowlarama,* there was a factual showing that the different terms were a result of "significant stresses affecting the total bowling retail market during the relevant period, and the differential reactions of the plaintiff and defendant bowling centers to such stresses with regard to their respective amount of business revenue." 377 F.Supp. at 408–09. Accordingly, this was a proper case for holding that no illegal discrimination had occurred. Like the court in *Craig,* the *Lang's Bowlarama* court also seemed to indicate that, had no such showing been made, it would have held the Act to have been violated:

> These differing arrangements arguably amount to illegal price discrimination since the effect of the "cash out" [a provision allowing the favored purchaser to pay for the products in one lump sum at a smaller total price than that paid by other purchasers, who paid over a course of time] was to allow defendant League Bowling to achieve final ownership of the commodities in question at a lesser cost than that paid by the plaintiff.

*Id.* at 408.[1]

Instead of the affirmative factual showing made in that case, defendant has presented no facts supporting its assertion here.

■ Plaintiffs also allege that defendant loaned money to Smith at prevailing rates of interest and guaranteed Smith's bank loans. These transactions did not affect the price at which Smith bought its products from defendant, and therefore we hold that they did not violate § 2(a).

---

1. Defendant also relies on *Rea v. Ford Motor Co.*, 355 F.Supp. 842 (W.D.Pa.1972), *rev'd on other grounds,* 497 F.2d 577 (3d Cir. 1974).

This case, however, concerned only § 2(e), not § 2(a), and is therefore inapposite.

■ Finally, we hold that the extension of credit to Smith did not violate §§ 2(d) or (e). These provisions prohibit a seller from discriminating between purchasers in furnishing or paying a customer in return for furnishing any services or facilities in connection with the processing, handling, sale or offering for sale of the product. Courts have universally held that these sections are not violated by differences in credit terms. See *Lang's Bowlarama, supra,* 377 F.Supp. at 408, and cases cited therein. Accordingly, defendant's motion is granted insofar as it relates to the allegation that the discriminatory credit terms violate §§ 2(d) and (e).

## TRANSFER OF ROUTES TO DISTRIBUTORS–BUYERS CORPORATION

In 1972 defendant entered into an agreement with Distributors-Buyers Corporation ("DBC"), a corporation composed of milk distributors in competition with plaintiffs, for the sale of the DBC members' full requirements of milk and milk products. As part of the written contract, defendant agreed to transfer to DBC, purportedly for one dollar and other valuable considerations, ten wholesale milk routes serviced by defendant. The routes were not made available to plaintiffs. Plaintiffs assert that these routes had a fair market value of $250,000.00 and that they were transferred to DBC in consideration of DBC's promise to purchase its members' requirements of milk and milk products from defendant. So regarded, this agreement, they contend, discriminated against them in violation of §§ 2(a) and (e) of the Act.

Defendant argues that summary judgment should be granted in its favor because this agreement did not constitute a discrimination in prices under § 2(a) or a discrimination in the furnishing of services connected with the resale of the products under § 2(e). We disagree.

Defendant's argument is based on the assertion that the milk routes were valueless and therefore that the prices paid by DBC for the milk and milk products were simply those set forth in the contract. Defendant points out that, according to several depositions given by individuals experienced in milk distribution in Chicago, the market value of such a business is equal only to the value of its equipment and accounts receivable. In this case, defendant retained its receivables, and DBC agreed to loan or purchase the equipment from defendant at fair market values. Therefore, nothing of value was conveyed with the routes. Furthermore, the undisputed evidence indicates that Borden had been losing money on the routes and was therefore eager to transfer them.

■ Our examination of the record, however, reveals that the value of the routes is subject to dispute. Although there is no evidence supporting plaintiff's assertion that the routes had a value of $250,000.00, there is evidence tending to show that the routes did have some value. First, after a period of losing money, DBC was able to earn a profit with the routes in the year ending April 30, 1974. Thus we think there is a permissible inference that the routes had a value in their potential for profit. More important, the reason DBC wished to acquire the routes, according to defendant, was to eliminate defendant as a competitor in the distribution of the products it manufactured. This aspect of the transaction also concededly had a positive value to DBC. Indeed, DBC made clear to Borden during their negotiations that it was willing to pay a few cents more for the milk if it could have the routes as well. (Deposition of Edward J. Ebel, president of DBC, at 61). We recognize that defendant has presented substantial evidence tending to show that the routes had no value. Nevertheless, on a motion for summary judgment, we may determine only whether a disputed issue exists; we may not resolve it.

■ We further hold that this issue is material to the outcome of this litigation because, assuming that the routes had a value, their conveyance to DBC as part of the consideration for the sale of milk and milk products amounted to an indirect price discrimination under § 2(a).

Although we have discovered no cases precisely like the one at bar, decisions in similar cases lend support to our conclusion. Courts in several cases have held § 2(a) to have been violated by sellers who have provided a "free" unit of the product sold to purchasers who bought a certain amount of the commodity. *National Dairy Products Corp. v. F. T. C.*, 412 F.2d 605 (7th Cir. 1969) (free case of fruit spread for every case bought); *Viviano Macaroni Co. v. F. T. C.*, 411 F.2d 255 (3d Cir. 1969) (first two orders placed by a purchaser were free); *Forster Mfg. Co. v. F. T. C.*, 335 F.2d 47 (1st Cir. 1964), *cert. denied*, 380 U.S. 906, 85 S.Ct. 887, 13 L.Ed.2d 794 (1965) (free case of clothespins for every case bought). Furthermore, § 2(a) is also violated by a seller who gives cash rebates to favored purchasers. *Sanitary Milk Producers v. Bergjans Farm Dairy, Inc.*, 368 F.2d 679 (8th Cir. 1966). The only discernible difference between those cases and this one is that here the seller provided the favored purchaser with something of value other than money or the commodity being sold. Liability under § 2(a), in our view, does not turn on such a distinction.

Defendant also contends that, as a matter of law, its transfer of routes to DBC did not violate § 2(e) because it was not an allowance or service connected with the resale of milk. We must reject this argument under the Seventh Circuit's decision in *Centex-Winston Corp. v. Edward Hines Lumber Co.*, 447 F.2d 585 (7th Cir. 1971), *cert. denied*, 405 U.S. 921, 92 S.Ct. 956, 30 L.Ed.2d 791 (1972). In that case the court held that discrimination in furnishing delivery services violated § 2(e) because it placed the disfavored purchaser, whose products were delivered later than those of its competitors, at a disadvantage in reselling the product:

> While it is true that the legislative history of the statute and the cases thereunder sometimes describe these [services or facilities covered by § 2(e)] as promotional services or facilities, consistently faster deliveries by defendant to plaintiff's competitors would obviously promote and facilitate their resales of lumber. Section

2(e) should not be confined to the conventional type of promotional services such as window displays, demonstrators, exhibits and prizes, for Section 2(d), and therefore its companion Section 2(e), was "made intentionally broader than this one sphere [payments for advertising and promotional services] in order to prevent evasion in resort to others [nonadvertising and nonpromotional services] by which the same purpose might be accomplished * * *." 80 Cong.Rec. 9418.

*Id.* at 587 (footnote omitted) [bracket insertion in ˙quotation from Congressional Record provided by Court]. The Court concluded that the services or facilities were "connected with the processing, handling, sale or offering for sale" of the product because a discrimination in the furnishing of deliveries impeded the resale of the product by the disfavored purchaser in relation to its competitors. Similarly, in this case, the transfer of the routes to DBC better enabled it to resell the products bought from defendant.

Defendant asserts that *Centex-Winston* was implicitly overruled by the following language in *Kirby v. P. R. Mallory & Co.*, 489 F.2d 904, 910 (7th Cir. 1973), *cert. denied*, 417 U.S. 911, 94 S.Ct. 2610, 41 L.Ed.2d 215 (1974): "Congress . . . drafted §§ 2(d) and 2(e) to apply exclusively to promotional discriminations like those alleged in this case [advertising allowances and display units]." The Court, however, did not repudiate the *Centex-Winston* holding that §§ 2(d) and (e) apply to discrimination affecting the resale of the product. Indeed, the quoted language was part of a passage holding that § 2(a) had not been violated. Accordingly, we cannot hold as a matter of law that the transaction did not violate § 2(e).

Defendant's motion for summary judgment on the issue of the transfer of routes to DBC is denied.

## MEETING–COMPETITION DEFENSE

█ Defendant has asserted that the sales to DBC did not violate the Act be-

cause any discrimination was justified by the meeting-competition defense under § 2(b). This section provides an absolute defense in cases where the seller provides the discriminatory prices or services in good faith to meet the equally low prices of a competitor or the services furnished by a competitor. The parties have argued the applicability of this defense to the selling price to DBC and to the routes furnished DBC as though these were two separate issues. However, evidence in the record indicates that DBC considered the sale of the milk products and the transfer of the routes as part of the same transaction; we therefore must consider the applicability of the § 2(b) defense to the transaction as a whole. So considered, we have decided to deny the motion for summary judgment in this regard.

According to the evidence in the record, the agreement with DBC was entered into after an extended period of negotiation. Officials of both defendant and DBC testified in depositions that DBC continually told defendant that the prices it was offering were higher than those offered by defendant's competitors. In addition, there is evidence that DBC told defendant that another supplier was offering to transfer twelve routes to it.[2] DBC did not specify, however, the identities of those competitors or the prices they were offering. Defendant felt that it was unable to match the prices DBC represented that it was being offered by other suppliers, and the prices it finally offered were higher. This final offer also included the transfer of ten routes, and was accepted by DBC.

To establish the § 2(b) defense, a seller need not show that its prices in fact met a competitive offer. It need only show the existence of facts that would lead a reasonable and prudent person to believe that the prices were necessary to do so. *F. T. C. v. A. E. Staley Manufacturing Co.*, 324 U.S. 746, 65 S.Ct. 971, 89 L.Ed. 1338 (1945).

Certainly there is evidence in the record that could warrant a factfinder in concluding that defendant discriminated in good faith to meet a competitive offer. Nevertheless, we cannot hold that the present record establishes this fact beyond dispute.

Section 2(b) imposes upon the seller the burden of showing that in good faith it believed its prices low enough to meet, but not beat, the competitive offer. *Hampton v. Graff Vending Co.*, 478 F.2d 527 (5th Cir.), *cert. denied*, 414 U.S. 859, 94 S.Ct. 69, 38 L.Ed.2d 109 (1973). Defendant has not pointed to any facts indicating that it had reason to believe its offer was no lower than those of its competitors. As indicated above, its offer must be regarded as consisting not only of the cash prices quoted, but also of the routes conveyed at nominal consideration—especially in view of DBC's statement to defendant that it was willing to pay a few cents more for the milk products if it could receive the routes as well. (Ebel deposition at 61). There is no evidence in the record indicating whether DBC told defendant how much more it was willing to pay or what a reasonable and prudent seller in defendant's position would believe the routes were worth. Since these facts have not been established, we cannot hold to a certainty that defendant had reason to believe it was not beating the offers of the competition.

For the same reason we must hold that defendant has not established the § 2(b) defense beyond dispute as to the allegation that the transfer of routes violated § 2(e). Not only is there a dispute as to the value of the transferred routes, but there is no evidence tending to show the value a reasonable seller in defendant's position would place on the competitive routes offered to DBC. Therefore, defendant has not established that it reasonably regarded the routes it transferred to DBC as no greater in value than the competitive routes.

---

**2.** This evidence consists of statements by Edward J. Ebel, president of DBC, and Alvin Kay, vice president of DBC. Richard C. Wagner, at the time defendant's group vice president and chief negotiator with DBC, testified that the transfer of routes was made in response to an offer by Sealtest of a covenant not to compete. (Wagner deposition at 29–30). He did not mention a competitive offer of a transfer of routes.

358

In view of this decision, we need not reach plaintiff's contention that defendant made no effort to verify that DBC's representations as to the competitive offers were true. We simply note that independent verification of a buyer's statements concerning competitive offers would seem to be required by the Supreme Court's decision in *F. T. C. v. A. E. Staley Manufacturing Co.*, 324 U.S. 746, 759, 65 S.Ct. 971, 977, 89 L.Ed. 1338 (1945). In that case the Court held that the F.T.C. was justified in holding that the meeting-competition defense had not been met:

> The Commission commented on the tendency of buyers to seek to secure the most advantageous terms of sales possible, and upon the entire lack of a showing of diligence on the part of respondents to verify the reports which they received, or to learn of the existence of facts which would lead a reasonable and prudent person to believe that the granting of a lower price would in fact be meeting the equally low price of a competitor.

*See also Viviano Macaroni Co. v. F. T. C.*, 411 F.2d 255 (3d Cir. 1969).[3] Indeed, Ebel, DBC's president, stated that he made a practice of telling all sellers that he had been made lower offers by their competitors. (Ebel deposition at 62). Defendant argues that it would have been impossible for it to verify DBC's representations.

Whether that statement is true is, of course, a question that can be deferred for resolution until trial.

### DIFFERENT DELIVERY ALLOWANCES

Finally, Borden argues that summary judgment should be granted in its favor on plaintiffs' allegation that it violated §§ 2(a) and (d) by paying Smith for delivering Borden products to Borden customers at a rate higher than it paid plaintiffs Wozniak's Dairy Service ("Wozniak") and J & R Service ("J & R") for making similar deliveries to other customers. It is undisputed that Smith, Wozniak and J & R did not purchase the products, but merely delivered them for defendant. We will grant the motion as it relates to § 2(d), but deny it as to § 2(a).

Under § 2(d), the discrimination in services and facilities must relate to the resale of the commodities being sold by the seller to the purchaser. *Kirby v. P. R. Mallory & Co.*, 489 F.2d 904, 910–11 (7th Cir. 1973), *cert. denied*, 417 U.S. 911, 94 S.Ct. 2610, 41 L.Ed.2d 215 (1974); *Centex-Winston Corp. v. Edward Hines Lumber Co.*, 447 F.2d 585 (7th Cir. 1971), *cert. denied*, 405 U.S. 921, 92 S.Ct. 956, 30 L.Ed.2d 791 (1972). In the present case, the delivery allowances were totally unrelated to the sale of milk products. In no way could they

---

**3.** No court has held that a seller has established the § 2(b) defense in a case where it was clear that the seller had not independently verified the buyer's representations as to competitive offers. For example, in *Hanson v. Pittsburgh Plate Glass Industries, Inc.*, 482 F.2d 220 (5th Cir. 1973), *cert. denied*, 414 U.S. 1136, 94 S.Ct. 80, 38 L.Ed.2d 761 (1974), the competitive prices were published in a price list. The court in *Calloway v. F. T. C.*, 362 F.2d 435 (5th Cir. 1966), stated that it was common knowledge in the industry that the seller's competitors were offering volume discounts. In *Jones v. Borden Co.*, 430 F.2d 568 (5th Cir. 1970), at least four different purchasers made essentially similar statements to the defendant about competitive prices. The seller in *Harbor Banana Distributors, Inc. v. F. T. C.*, 499 F.2d 395 (5th Cir. 1974), had independent knowledge that discriminatory delivery of bananas directly to a favored purchaser's processing plant was necessary to meet competition because a competi-

tor had constructed a delivery terminal adjacent to the buyer's plant with a conveyor belt between the two. The courts in *Cadigan v. Texaco, Inc.*, 492 F.2d 383 (9th Cir. 1974), and *Krieger v. Texaco, Inc.*, 373 F.Supp. 108 (W.D. N.Y.1973), did not state whether the sellers had independently verified the buyers' representations. Defendant relies on *Forster Mfg. Co. v. F. T. C.*, 335 F.2d 47 (1st Cir. 1964), *cert. denied*, 380 U.S. 906, 85 S.Ct. 887, 13 L.Ed.2d 794 (1965), but the court there did not hold that the seller need not take steps to verify the buyer's representations. Rather, it set aside a Commission decision that the seller's failure to ascertain in advance the identity of the competitor and the competitive price prevented it from establishing that it acted in good faith. At the same time, the court remanded the case to the Commission for application to the evidence of the reasonable-and-prudent person standard set forth in *Staley*.

be characterized as facilitating the resale of Borden's milk products by Smith.

We agree, however, with plaintiffs that there is a genuine dispute as to whether the different delivery allowances constituted indirect price discrimination in violation of § 2(a). Plaintiffs allege that the different payments were unrelated to the actual work performed by Smith, J & R and Wozniak. If that is in fact the case, then the different allowances would amount in effect to a rebate to Smith. *American Cooperative Serum Association v. Anchor Serum Co.*, 153 F.2d 907, 913 (7th Cir. 1946), *cert. denied*, 329 U.S. 721, 67 S.Ct. 57, 91 L.Ed. 625 (1946). Defendant argues that, because there is no evidence on the question of whether the allowances exceeded a reasonable fee for the services rendered, plaintiffs have failed to meet their burden of proof on this issue. Borden has misconstrued the purpose of Fed.R. Civ.P. 56. Since Borden is the moving party, it bears the burden of establishing beyond dispute that it is entitled to judgment.[4]

Accordingly, defendant's motion is granted as it relates to the allegation that the different delivery allowances violate § 2(d), but denied as it relates to the allegation that they violate § 2(a).

To sum up our decision in this case: Judgment is granted in favor of defendant on the allegations that the extensions of credit to A. L. Smith Milk Distributors violated §§ 2(d) and (e) of the Robinson-Patman Act; that the loans to Smith and guarantees of Smith's bank loans violated §§ 2(a), (d), and (e); and that the higher delivery allowances paid Smith violated § 2(d). In all other respects, defendant's motion for summary judgment is denied.

4. Borden mistakenly relies on a decision by the Federal Trade Commission in *In the Matter of General Foods Corp.*, 42 F.T.C. 798 (1956), which affirmed the dismissal by the hearing examiner of an allegation that a similar practice violated § 2(a). The reason for the dismissal was that the counsel supporting the complaint had not shown that the payments were disproportionately greater than the services rendered by the customer. That case was decided after a full hearing, in which the complaint counsel properly had the burden of proof on the issue. Similarly, at the trial of this case, plaintiffs will have the burden of establishing that defendant violated the Act. In response to a motion for summary judgment, however, plaintiff need not present any evidence unless it is necessary to rebut evidence presented by defendant.